# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | |
|---|---|
| **JAMES KUYKENDALL,** | CIVIL ACTION No. _____ |
| *Plaintiff,* | |
| **vs.** | **COMPLAINT** |
| | **and DEMAND FOR JURY TRIAL** |
| **AMAZON STUDIOS, LLC, HECTOR BERRELLEZ, JOHN MASSARIA, GOOD PIXEL PRODUCTIONS, TILLER RUSSELL, and THE INTELLECTUAL PROPERTY CORPORATION,** | |
| *Defendants.* | |

COMES NOW, Plaintiff JAMES KUYKENDALL, by and through his counsel, as and for his Complaint against Defendants Amazon Studios, LLC ("Amazon Studios"), Hector Berrellez ("Berrellez"), John Massaria ("Massaria"), Good Pixel Productions ("Good Pixel"), Tiller Russell ("Russell"), and the Intellectual Property Corporation ("IPC") (collectively, "Defendants"), complains and alleges as follows:

## PRELIMINARY STATEMENT

1.      In February 1985, Enrique "Kiki" Camarena, a Special Agent with the Drug Enforcement Administration ("DEA"), was kidnapped, savagely tortured for over 30 hours, and then gruesomely murdered in Guadalajara, Jalisco, Mexico. His captors and killers were leaders and operatives of the Guadalajara Cartel ("the Cartel"), a violent drug trafficking organization with vast criminal operations around the world, which Special Agent Camarena was investigating at the time of his capture.

2.      In the years following Camarena's tragic death, the incident was exhaustively investigated by U.S law enforcement agencies, culminating in the prosecution and conviction, either in the United States or in Mexico, of numerous "drug lords" and operatives associated with the Cartel.

3.      On July 31, 2020, some 35 years after Camarena's murder, Defendant Amazon Studios released a four-part television series, entitled *The Last Narc* (the "Show"), that purported to tell the "true story" of how Camarena was murdered and by whom.[1] The series, totaling about three hours in length, was produced by Amazon Studios and by Defendants Massaria, Russell, Good Pixel, and IPC, and starred Defendant Berellez. Since its release, the Show has grown in popularity and remains accessible to the 126 million Amazon Prime subscribers around the world.[2]

4.      The Show masquerades as a factual documentary, but in reality, it aims to capitalize on Camarena's tragic murder by scandalizing it for profit and for entertainment value. The lurid conspiracy narrative which forms the basic premise for the Show is that Camarena was killed, not by the Cartel, but by agents of the Central Intelligence Agency ("CIA") and other American officials who secretly conspired with the Cartel to traffic drugs into the United States so that the proceeds could be used to fund the Contras then fighting the Communist regime in Nicaragua. The Show posits that Camarena was murdered because he had discovered, and was about to expose, this supposed deep-state conspiracy.

---

[1] *The Last Narc*, https://www.amazon.com/The-Last-Narc-Season-1/dp/B08D11X73N (last accessed December 18, 2020).

[2] This number is current as of October 2020, according to Digital Commerce 360, citing to Consumer Intelligence Research Partners reports. https://www.digitalcommerce360.com/article/amazon-prime-membership/ (last accessed December 18, 2020).

5.      As part of this far-fetched narrative, the Show falsely and despicably accuses Plaintiff Kuykendall – a now-retired DEA agent who, at the time of Camarena's death, was Camarena's supervisor at the Guadalajara DEA Field Office – of complicity in the murder of his close friend and fellow agent.

6.      Specifically, the Show falsely claims that Plaintiff received bribes from the Cartel, that he was present at Cartel meetings where Camarena's kidnapping was planned, that he then aided and abetted the execution of that plan, and that he deliberately sabotaged the trial of one of Camarena's murderers by lying for the Cartel.

7.      These are patent lies. Plaintiff Kuykendall – a decent and hard-working public servant and private citizen who spent decades putting his own life in harm's way to keep the nation safe from violent criminals like the Guadalajara drug lords – had nothing to do with his friend's tragic death and disdains the very notion of aiding or abetting the Cartel. Defendants' claims to the contrary have utterly no basis in fact.

8.      Defendants knew all of this when they deliberately and maliciously defamed Plaintiff Kuykendall by producing, publishing, and distributing the Show.

9.      The Show is little more than a shill for the Mexican drug cartels – an irresponsible and dishonest fiction that attempts to deflect responsibility for Camarena's heinous murder from the drug lords who perpetrated it to dedicated American law enforcement agents like Plaintiff Kuykendall. In fact, much of the Show's narrative is built around extended interviews with three so-called "Cartel insiders" – former Mexican police officers who defiled their badges by volunteering to serve as bodyguards for drug kingpins, and who now have the temerity, decades later, to appear in front of a camera and remorselessly admit their direct complicity in Camarena's murder, in a television series designed to make these cowards look like heroes. The Show's final blow

against Plaintiff Kuykendall relies on an even bigger coward, another so-called "Cartel insider" who remains unnamed and unseen as he "emerges" 35 years after Camarena's death to cast vicious and insidious aspersions on Plaintiff Kuykendall. The Show unwaveringly presents the statements of these "insiders" as true, but Defendants had every reason to know the statements were completely false.

10.     The Show also relies heavily on interviews with Defendant Berrellez, a former "rogue agent" with the DEA whom the agency investigated and disavowed on account of his having suborned perjury by witnesses at the trial of one of Camarena's murderers, and for having illegally orchestrated the abduction and extraterritorial rendition of a doctor working for the Cartel. Years after the fact, Berrellez was placed in charge of part of the investigation into Camarena's murder, but he was not in Guadalajara at the time of the kidnapping itself and had no direct knowledge of any of the actual facts surrounding the event. Nor do the official reports of his investigation reflect any involvement (or even suspicion of involvement) by Plaintiff Kuykendall in his friend's death. Nevertheless, the Show disingenuously presents Berrellez and the Cartel witnesses' lies about Plaintiff Kuykendall as if they were true statements.

11.     Throughout the Show, Defendants actively mislead viewers into believing that the Show's portrayal of Plaintiff Kuykendall is accurate. Defendants intersperse interviews of cartel henchmen and discredited former DEA agents with archival news footage and scenes of whirring microfilm projectors, along with staged reenactments of events surrounding the murder, to make it seem like a factual news exposé. And Defendant Amazon Studios promotes and distributes the Show as a "documentary," repeatedly describing it as the "true story" behind Camarena's death. In reality, the Show presents a web of fictions and deceptions, falsely depicting Plaintiff Kuykendall as

4

a criminal and a traitor, while willfully omitting and obfuscating the truth, solely to "entertain" viewers and to line Defendants' pockets.

12.     Defendants acted with actual malice when producing, publishing, and distributing the Show, because they knew that the Show's portrayal of Plaintiff Kuykendall, and the conduct attributed to him therein, are false. Defendant Russell, as well as representatives from Amazon, spoke with Plaintiff Kuykendall about the Show while it was in development, and Plaintiff Kuykendall made Defendants aware of the complete falsity of what they intended to publish about him, demanding that they not publish. Defendants also knew or should have known of myriad facts available in the public domain—including in judicial proceedings—which directly contradict the Show's statements about, and depictions of, Plaintiff Kuykendall. Defendants nevertheless moved forward with actual malice, knowingly publishing harmful falsehoods about Plaintiff Kuykendall in the Show and in related publications.

13.     As a result of Defendants' publication of the Show, which continues to stream on Amazon's platform, and their representations of the Show as a "true" account of historical events, Defendants have defamed Plaintiff Kuykendall and willfully besmirched and damaged his good name, his reputation, and his legacy. Defendants have exacerbated this reputational harm by providing and participating in online forums inviting the Show's viewers to submit negative comments about Kuykendall, causing a proliferation and perpetuation of the defamatory comments made about him.

14.     Defendants' defamatory depictions and accusations have also inflicted and continue to inflict upon Plaintiff Kuykendall immense emotional distress—not only by bringing to the fore painful past events, but also by causing family, friends,

acquaintances, former colleagues, and reporters to question his integrity and to highlight the negative impact of the Show on his reputation.

15.     Moreover, Defendants included images of Plaintiff Kuykendall and audio recordings of his voice in the Show without seeking or acquiring his authorization (which they did not have), thus violating his right to publicity by misappropriating his identity, and falsely suggesting that he voluntarily participated in the production of the Show, in order to bolster its narrative and credibility as a purported documentary.

## JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). This is a diversity action asserting claims under Texas law for defamation, intentional infliction of emotional distress, and violation of Plaintiff's right of publicity (misappropriation of his identity). The parties are completely diverse in citizenship, and the amount of damages sought in this action exceeds $75,000.

17.     This Court has personal jurisdiction over Defendant Amazon Studios, as it continuously and systematically conducts business, advertises, and provides and promotes content to Amazon Prime subscribers throughout Texas.

18.     In addition, this Court has personal jurisdiction over all Defendants under Texas law because the defamatory content at issue here, produced, published, and distributed by Defendants, is directed at Plaintiff Kuykendall, who resides in Texas. Moreover, Plaintiff Kuykendall suffers the harmful effects of the torts in Texas – meaning that the torts giving rise to this action occurred in this State. In addition, Defendants interviewed various sources in Texas in the development of the Show (including Plaintiff Kuykendall); Defendants all benefit from distribution of the Show nationwide, including in Texas; and Defendants all knew at the time of the publication

of the Show that Plaintiff Kuykendall, the subject of the defamatory content here, resides in Texas.

19.     Venue is properly before the District Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this claim occurred in this District. The Show is available for viewing in all 50 states, including Texas; Russell and representatives from Amazon Studios reached out to Kuykendall to discuss development of the Show while he was at home in Texas; and Plaintiff Kuykendall primarily suffers the harm from the Show's false depiction of him where he works and lives—in Texas.

## PARTIES

20.     Plaintiff JAMES KUYKENDALL, also known by his nickname Jaime, is a former DEA agent, thirty-year public servant, and current real estate professional. He resides in Laredo, Texas.

21.     Defendant AMAZON STUDIOS, a television and film production and distribution company, produced, published, and distributed the Show, and holds the copyright for the Show. Its principal film studios are in Culver City, California, and its corporate headquarters are at 1620 26th Street, Suite 4000n, Santa Monica, CA 90404. Amazon Studios is a subsidiary of Amazon, Inc., whose digital streaming service, Prime Video, is the medium by which Amazon Studios distributes and displays the Show.

22.     Defendant BERRELLEZ assisted in the development of, and was featured in, the Show. Berrellez also published, in November 2020, his related book entitled, *The Last Narc: A Memoir by the DEA's Most Notorious Agent.* He resides in Riverside, California.

23.     Defendant MASSARIA is a television producer and video and sound editor who resides in Northport, New York. He owns and operates the video production

company Sit Pixel Sit...Good Pixel Productions, and he was integrally involved in the production of the Show.

24.     Defendant GOOD PIXEL, a subsidiary of Defendant Massaria's Sit Pixel Sit...Good Pixel Productions, is a full-service production company based in Northport, New York and participated in the development and production of the Show.

25.     Defendant RUSSELL is a television producer and director who developed, directed, and produced the Show. On information and belief, he resides in Santa Fe, New Mexico. Defendant Russell works in cooperation with Defendant IPC.

26.     Defendant IPC, is a production studio based in Van Nuys, California and is a subsidiary of Industrial Media. In addition to co-producing the Show, it produces a wide range of television, film, documentary, and digital content, often in cooperation with broadcast and cable networks.

## FACTUAL ALLEGATIONS

## I.     HISTORICAL BACKGROUND

### A.     Retired Special Agent Jaime Kuykendall

27.     Plaintiff James "Jaime" Kuykendall was born and raised in South Texas. He has spent most of his adult life serving the people of the United States, often placing his life in danger to protect his country. He began his career with the Border Patrol, before serving two years in the Army in the 1960s. After an honorable discharge from the military, Mr. Kuykendall returned to the Border Patrol and then in 1966 became a United States Customs investigator in Texas. Plaintiff Kuykendall joined the DEA in 1973, shortly after the agency was created. During his 16 years with the DEA, he served at posts in Quito, Ecuador; Houston, Texas; Guadalajara, Mexico; and finally Laredo.

28.     Plaintiff Kuykendall was assigned to the DEA Guadalajara Field Office in 1982, where he served as Resident Agent in Charge until 1985. He supervised Special Agent Camarena from 1982 until Camarena was kidnapped and murdered in 1985. Agents Camarena and Kuykendall were colleagues and close friends. Kuykendall actively participated in the initial investigations into Camarena's disappearance and murder, before leaving Guadalajara in September of that year (1985), when he was transferred to DEA's Laredo Field Office.

29.     Plaintiff Kuykendall served as Special Agent in Charge of the DEA Field Office in Laredo from September 1985 until June 1989, when he retired from law enforcement after more than thirty years of service. During his time in law enforcement, Plaintiff Kuykendall received multiple awards and decorations for superior performance and outstanding contributions.

30.     In the three decades following his retirement from the DEA, Mr. Kuykendall has worked as a private investigator, insurance adjuster, security consultant, and security chief for a mining company. He currently lives a quiet and private life with his wife in Laredo, Texas, where he works as a residential real estate appraiser. He has five children and three stepchildren, five of whom also live in Texas, and one of whom— his namesake—is also a retired DEA agent.

31.     In 2005, Plaintiff published a nonfiction book about his DEA experiences, focusing on Camarena's murder and kidnapping, entitled, *¿O Plata O Plomo?: 'Silver or Lead,' The Abduction and Murder of DEA Agent Kiki Camarena.* He also served as a program consultant for the Netflix show *Narcos: Mexico*, which premiered on November 16, 2018, and in which Plaintiff Kuykendall was portrayed by an actor.

### B.    Special Agent Kiki Camarena

32.    During the years that Agents Camarena and Kuykendall worked together in Mexico, the DEA operated a Field Office out of the U.S. Consulate in Guadalajara, in the Mexican state of Jalisco. Plaintiff Kuykendall was the Resident Agent in Charge at the Guadalajara Field Office from 1982 to 1985.

33.    Special Agent Camarena was assigned to Guadalajara in 1980, where he investigated the Cartel and other drug traffickers and their operations and networks until he was kidnapped and murdered in 1985.

34.    During the time Special Agent Camarena was assigned to the Guadalajara Field Office, the office was authorized to maintain a force of six agents and two support staff. Between 1980 and February 1985, approximately nine different agents and five different support staff worked in the Guadalajara office.

35.    As is now known, on the morning of February 7, 1985, Agent Camarena made plans to meet his wife for lunch. Shortly after he left the office that afternoon for this lunch meeting, he was abducted, after which he was interrogated, brutally tortured for more than 30 hours, and then wantonly murdered by operatives of the Cartel. His body, along with that of Mexican pilot (and Camarena associate) Captain Alfredo Zavala, was discovered in the Mexican state of Michoacán on March 5, 1985.

### C.    The DEA's Investigation of Camarena's Murder

36.    The DEA, the FBI, and the Mexican Federal Judicial Police ("MFJP") conducted initial investigations into the kidnapping and murder of Agent Camarena and Captain Zavala. On May 3, 1985, an investigative team was established within the DEA

to coordinate the ongoing investigation into the abduction of Agent Camarena and Captain Zavala.[3] This investigation was named Operation Leyenda ("Legend").

37.   Operation Leyenda, together with the efforts of the FBI and the MFJP, eventually resulted in the arrest in Mexico of several narcotics traffickers and their associates, which included Cartel top drug lords Rafael Caro-Quintero and Ernesto Fonseca-Carrillo. Mexican officials refused to extradite Caro-Quintero and Fonseca-Carrillo to the United States; instead, following their convictions in Mexican courts, they were imprisoned in Mexico.[4] However, while Mexican authorities, as well as the DEA and FBI, continued to investigate Camarena's kidnapping and murder for years, endemic corruption in the Mexican political and law enforcement systems, along with evidentiary and witness credibility issues, frustrated efforts to discern the whole truth.

**D.   Hector Berrellez**

38.   Defendant Berrellez joined the DEA as a special agent in 1974 and served in the agency until he left in 1996. As an agent, he was assigned to work in Arizona; Mazatlán, Mexico; Los Angeles; and Washington, D.C.

39.   At the time of Agent Camarena's murder, Berrellez was working in Los Angeles, where he had been stationed for two years. He was not in Guadalajara during the events surrounding Camarena's death and had no firsthand knowledge of any of those events.

40.   In January 1989, Defendant Berrellez, then still stationed at the DEA Field Office in Los Angeles, was assigned to part of Operation Leyenda. By that time, he had

---

[3]   DEA.gov,   https://www.dea.gov/sites/default/files/2018-07/1985-1990%20p%2058-67.pdf (last accessed Dec. 16, 2020).

[4]   DEA.gov,   https://www.dea.gov/sites/default/files/2018-07/1985-1990%20p%2058-67.pdf (last accessed Dec. 16, 2020).

spent little if any time in Guadalajara. Even after he was assigned to Operation Leyenda, he worked from Los Angeles, not from Guadalajara.[5]

41.    Despite the fact that Berrellez was not assigned to or present in Guadalajara prior to 1985 and was not assigned to the investigation into Camarena's murder until 1989, he is the primary narrator throughout each episode of the Show.

42.    Berrellez's main role in Operation Leyenda was to recruit witnesses to testify against Mexican drug lords. Many of them were paid informants, whose security Berrellez arranged despite the fact that they were violent Cartel operatives with direct complicity in Agent Camarena's murder, among dozens of other criminal acts.

43.    The credibility of most of the informants and witnesses that Berrellez recruited and paid was contemporaneously called into question, and has continuously been questioned since the early 1990s.

44.    For example, witness Hector Cervantes-Santos, a former Mexican state police officer who was also a Cartel security guard, testified at the 1990 federal trial of Ruben Zuno-Arce. In 1997, "Cervantes came forward and said his testimony at the 1990 trial was a lie. He said a prosecutor Manuel Medrano[6] and DEA agent Hector Berrellez gave him a script and told him to implicate Zuno-Arce. Cervantes said that, in return for this coached testimony, he was promised hundreds of thousands of dollars and that he and his family would be moved to the United States and protected here. Cervantes was questioned about these allegations, and he passed a polygraph test arranged by defense attorneys. A former chief of the DEA, Terrence Burke, told The Times that he

---

[5] Jason McGahan, "From the DEA office in Los Angeles, he would track down the insiders willing to trade privileged information for cash." *L.A. Weekly*, Jul. 3-9, 2015, at 12. https://www.laweekly.com/wp-content/uploads/2019/09/070215-496334.pdf (last accessed Nov. 18, 2020).

[6] Former Assistant U.S. Attorney Medrano is also featured extensively in the Show.

interviewed Cervantes at length and concluded that his allegations of having lied should be treated seriously and appeared credible."[7]

45.    By 1995, the DEA's Office of Professional Responsibility ("OPR") had conducted an official inquiry into whether Defendant Berrellez had coached witnesses and suborned perjury.[8] By the time of his departure from the DEA in 1996, OPR had also investigated Berrellez for more than two years regarding his orchestration in 1990 of the unlawful abduction and extrajudicial rendition of Mexican doctor Humberto Álvarez-Machaín, an act to which he freely admits (and boastfully but inaccurately details) in the Show. At the time of the rendition, and continuously since, DEA officials disavowed Berrellez's action, referring to him as a "rogue agent."

### E.    The Cartel Trials

#### 1.    The 1988 Verdugo Trial

46.    The first trial held in the United States of defendants accused of complicity in Camarena's murder began in 1988 in Los Angeles. (This was before Berrellez was participating in Operation Leyenda.) Nine defendants had been indicted in the case, including René Verdugo-Urquidez and Raul Lopez-Alvarez, who were charged with

---

[7] Fredric Tulsky, "Camarena Case Perjury Allegation Derided." Jan. 17, 1998, *Los Angeles Times*, https://www.latimes.com/archives/la-xpm-1998-jan-17-mn-9150-story.html (last accessed Nov. 20, 2020). *See also United States v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1093 (C.D. Cal. 1998) ("On July 1, 1997, five years after Zuno-Arce was convicted at the second trial, and seven years after Cervantes-Santos testified at the first trial, Cervantes-Santos signed a declaration in Los Angeles wherein he recanted his *Zuno I* testimony and stated that his perjury was guided and directed by the case agent, former DEA Special Agent Hector Berrellez, and one of the prosecutors, former Assistant United States Attorney Manuel Medrano.").

[8] Fredric Tulsky, "Evidence Casts Doubt on Camarena Trials." *Los Angeles Times*, Oct. 26, 1997, https://www.latimes.com/archives/la-xpm-1997-oct-26-mn-46907-story.html (last accessed Nov. 19, 2020).

Agent Camarena's murder, and Jesus Feliz-Gutierrez, who was charged as an accessory.[9]

47.     At this trial, the prosecution presented gruesome recordings that the Cartel kidnappers had made of Agent Camarena's torture. Those recordings include Camarena's voice and voices of his captors.

48.     Mr. Kuykendall testified extensively at this trial, and his testimony was crucial to obtaining convictions. Verdugo-Urquidez, Lopez-Alvarez, and Feliz-Gutierrez were all convicted of the charges and sentenced to lengthy prison terms.

### 2.     The 1990 Zuno I Trial

49.     The second U.S. trial for the murder of Agent Camarena took place in Los Angeles in the summer of 1990. Two of the defendants were accused of plotting Camarena's kidnapping and murder—Juan Ramon Matta-Ballesteros, a Honduran drug lord, and Ruben Zuno-Arce, the man who previously owned the home in which Camarena was held and tortured. Zuno-Arce was an influential Mexican businessman with purported links to the Cartel and to the Mexican government (he was the brother-in-law of a former Mexican president).

50.     The other defendants in this trial were Juan Jose Bernabe-Ramirez, a former Jalisco state policeman accused of being a bodyguard at the Guadalajara house where Camarena was tortured; and Javier Vasquez-Velasco, also a Mexican citizen, accused of murdering an American writer and Cuban-American medical student whom he had mistaken for DEA agents and killed just days before Camarena was kidnapped.

---

[9] *New York Times*, July 31, 1988, https://www.nytimes.com/1988/07/31/us/trial-opens-in-death-of-tortured-drug-agent.html (last accessed Dec. 16, 2020).

51.     Over 50 witnesses testified at this trial, including DEA and FBI agents and, among others, over a dozen DEA informants whom Defendant Berrellez had recruited and paid, most of whom had engaged in criminal activity on behalf of the Cartel and were granted immunity in exchange for their testimony.[10] This includes the aforementioned Cervantes-Santos, who later recanted his testimony and declared that Berrellez had coached him to lie.

52.     Plaintiff Kuykendall, who had retired from the DEA in 1989, testified at this trial as a civilian witness for the prosecution, providing testimony on May 15 and 16, and June 8 and 27, 1990.

53.     Matta-Ballesteros and Bernabe-Ramirez were convicted of kidnapping Camarena, and of conspiracy, but were acquitted of the murder charges.

54.     Zuno-Arce was also convicted, but the district court threw out the verdict and granted him a new trial due to prosecutorial misconduct.

### 3. The 1992 Zuno II Trial

55.     The Government retried Zuno-Arce in December 1992. At this trial, the Government also prosecuted Humberto Álvarez-Machaín, the Mexican doctor whose unlawful abduction and rendition Defendant Berrellez had orchestrated in 1990.

56.     The court dismissed the charges against Álvarez-Machaín at the conclusion of the Government's case, finding that no evidence had been presented to support the charges against him. Zuno-Arce was convicted of violent acts in aid of racketeering, conspiracy, and the abduction of Agent Camarena.

57.     Plaintiff Kuykendall did not testify at this trial.

---

[10]     Weinstein, Henry. *The Los Angeles Times*, June 19, 1990. https://www.latimes.com/archives/la-xpm-1990-06-19-me-63-story.html (last accessed Dec. 16, 2020).

II.     **DEVELOPMENT AND PUBLICATION OF THE SHOW**

    A.     **Communications Between Producers and Kuykendall.**

    58.     On December 17, 2019, Defendant Russell sent Plaintiff Kuykendall a letter which outlined "allegations of criminal conduct that [were] made against him by three former Jalisco state police officers." *See* Exhibit 1, attached. Russell knew that these three dirty cops had served as bodyguards for Guadalajara Cartel kingpins, that they were directly involved in Agent Camarena's kidnapping and murder, and that, at Defendant Berrellez's instigation, they had been relocated to the United States and compensated for their testimony at one or more trials of Cartel operatives. Russell's letter also lists an unnamed fourth witness, "a former Guadalajara Cartel member who we interviewed," along with further allegations against Plaintiff Kuykendall.

    59.     Russell's December 17 Letter details the false allegations against Plaintiff Kuykendall which Defendants planned to publish in the Show, including:

        A.  "they witnessed you personally receiving large sums of money from [Ernesto Fonseca] Carrillo and/or known criminal associates of Carrillo [*sic*] in Guadalajara on at least two occasions in 1984 and 1985";

        B.  "you were present in early 1985 at a meeting held at the American Motors hotel where the abduction of Kiki Camarena was planned";

        C.  the unnamed fourth witness "personally accompanied Jalisco state police commander Gabriel Gonzalez Gonzales on three occasions in the 1980s when Mr. Gonzalez delivered money to you at the U.S. Consulate in Guadalajara";

D.  the unnamed fourth witness "attended a meeting at which the abduction of Kiki Camarena was planned, and at that meeting, he witnessed and overheard you agreeing to provide Guadalajara Cartel operatives with the information about Mr. Camarena, including what Mr. Camarena was wearing on the day he was abducted, and what time he was expected to leave the consulate building"; and

E.  that Kuykendall "testified on behalf of Ruben Zuno-Arce in 1992, when Mr. Arce [*sic*] was being prosecuted for his role in Mr. Camarena's murder, a charge on which […] he was ultimately convicted."

60.    Each and every one of these allegations about Plaintiff Kuykendall was patently and completely false, and Russell knew or should have known this at the time he sent the letter. Russell nevertheless demanded a reply from Plaintiff Kuykendall to these false allegations by January 7, 2020, allegedly "to be able to effectively incorporate [his] participation into the series." *See* Exhibit 1, at 2.

61.    Plaintiff Kuykendall timely responded to Russell with a letter dated December 24, 2019, denying and refuting each of the allegations and assertions Russell had made about him in the December 17 letter and demanding that Russell cease and desist from publishing these lies. *See* Exhibit 2, attached.

62.    On April 22, 2020, counsel for Plaintiff Kuykendall wrote to Defendant Amazon Studios, to Amazon, Inc.'s legal department, and to Defendant Russell to further address the still-pending publication of the Show. *See* Exhibit 3. Plaintiff

Kuykendall again flatly denied the false allegations set forth in Russell's December 17 letter, and again demanded that Defendants avoid defaming his character.

63.     On that same date, counsel for Kuykendall also sent a letter to Cameron Stracher, counsel for Buckingham Television, an original producer for the Show, restating the same denials and demanding the Show's producers to confine the so-called "documentary" to facts, and to not defame his good name. *See* Exhibit 4, attached. The next day, April 23, 2020, Stracher wrote to Plaintiff Kuykendall, claiming to be soliciting more facts. *See* Exhibit 5.

64.     On May 4, 2020, counsel for Plaintiff Kuykendall responded to Stracher with additional details about where Defendants could find resources to more thoroughly vet (and disprove) the assertions about Plaintiff Kuykendall that Amazon Studios and Russell planned to release in the Show. *See* Exhibit 6, attached.

65.     Despite his having provided Defendants with a detailed roadmap to the truth, Plaintiff Kuykendall received no further contact from Defendants or their counsel, who ignored his pleas to be left out of their program and to be left alone. Defendants were clearly not interested in the truth; instead, they prioritized profit from publishing a sensational and unfounded conspiracy narrative over the reputation of a decent and honorable man.

66.     Defendants' lies and defamatory statements concerning Plaintiff Kuykendall were released to the world on July 31, 2020, when Amazon Studios released *The Last Narc*; it remains available for viewing to this day on the Amazon Prime Video streaming platform, which has an estimated 125 million subscribers worldwide.

67.     Defendant Russell has claimed, in various articles promoting the Show, that he conducted 14 years' worth of research into Agent Camarena's murder, after

18

which he shot and edited the Show for two years. Yet he only reached out to Plaintiff Kuykendall for comment at the end of 2019, and even then, he still did not follow the path to truth that Kuykendall laid out for him before the Show's release.

68.     Despite Kuykendall's explicit and continued avowal that Defendants' narrative was false and defamatory, and despite Plaintiff Kuykendall and his counsel's demanding that Defendants publish only the truth, Defendants chose to ignore, obfuscate, and misstate the facts, falsely claiming "to discover the truth." In the process, Defendants smashed and besmirched Plaintiff Kuykendall's life-long reputation and legacy as a loyal and dedicated public servant, solely for ratings and profits. Defendants continue to perpetuate and proliferate these lies about Kuykendall in the media.

## III.   DEFAMATORY CONTENT IN *THE LAST NARC*

### A.    Specific False Statements and Representations in the Show

69.     The Show presents two specific sets of defamatory statements and representations about Plaintiff Kuykendall: (1) that he gave false testimony at the first (1990) trial of Zuno-Arce that was designed to sabotage the trial and that was testimony he offered "on behalf of" the Cartel, and (2) that he took bribes from the Cartel, and was directly involved in planning and executing Camarena's kidnapping, including through his attendance at planning meetings and his alleged willingness to inform the Cartel as to Agent Camarena's movements and attire. Both sets of statements are false, outrageous, and plainly defamatory.

### 1.    *Kuykendall 1990 Zuno I Trial Testimony*

70.     Plaintiff Kuykendall, who retired from the DEA in 1989, testified as a civilian over several days in the 1990 *Zuno I* Trial, which opened on May 15, 1990. Called as a witness by and for the prosecution, Plaintiff Kuykendall testified on May 15

and 16, and again on June 8 and 27. The full transcripts of Plaintiff Kuykendall's testimony in the 1990 *Zuno I* Trial are publicly available,[11] and relevant excerpts are attached as Exhibit 7. His testimony was in all respects completely truthful.

71.     Throughout his testimony, Plaintiff Kuykendall was asked a great many questions about Zuno-Arce, including as to Zuno-Arce's prior ownership of the property in which Agent Camarena was interrogated and tortured. He was also asked about a DEA-6 report of investigation dated January 13, 1984, signed by Agents Kuykendall and Camarena, which lists information they had gathered about marijuana growers, traffickers, and cartel financiers, among other things, but which notably ***did not*** include Zuno-Arce's name.

72.     As elaborated below, the Show devotes several minutes discussing Plaintiff Kuykendall's testimony in the 1990 *Zuno I* Trial, displaying and reading excerpts from the testimony, completely out of context, with the intended effect of misleading viewers and defaming Plaintiff Kuykendall.

73.     Specifically, the Show highlights a series of questions Kuykendall was asked on cross-examination about a meeting he had conducted with Zuno-Arce in 1986 in Texas, at which Zuno-Arce appeared voluntarily and at which Plaintiff Kuykendall was acting in his official capacity as the DEA Special Agent in Charge in Laredo. The defense attorney was asking Plaintiff Kuykendall why Zuno-Arce was allowed to leave that meeting and return to Mexico, and also about what evidence the DEA had, in 1986, about whether Zuno-Arce had been involved in Camarena's kidnapping.

74.     As the trial transcript makes clear, around 1985, Plaintiff Kuykendall had come to *suspect* that Zuno-Arce was involved in drug trafficking, but the evidence of *his*

---

[11] https://reneverdugo.org/Zuno.html (last accessed Dec. 16, 2020).

*suspicion* was excluded as inadmissible, as was the hearsay basis for that suspicion. As such, the parties were limited to asking Plaintiff Kuykendall about his actual personal knowledge at the time of the 1986 interview. *See* Ex. 7, Tr. Jun. 8, 1990, at 15-80 – 15-88. The Show deliberately omits this critical context.

75.     Given these evidentiary rulings, when Plaintiff Kuykendall was asked at the trial what he actually *knew* (as opposed to suspected) about Zuno-Arce's relationship to the Cartel at the time of that meeting, he truthfully testified that **he** (speaking for himself only, and not for the DEA) "didn't know anything" about that subject; to his knowledge, the DEA had no actual evidence at that time to confirm Zuno-Arce's involvement in drug trafficking. *See* Ex. 7, Tr. Jun. 8, 1990, at 15-66, lines 1-10.

76.     This was entirely true. By the time of the 1986 meeting, Plaintiff Kuykendall had been transferred out of Guadalajara to Laredo, and he was not assigned to work on Operation Leyenda; he therefore had no basis to know what, if any, evidence the DEA had acquired about Zuno-Arce following his transfer. And by the time of his testimony at the 1990 Trial, he was a civilian, no longer privy to government information, and he was not briefed on the government's case against Zuno-Arce. So, when the defense attorney asked Plaintiff Kuykendall in 1990 whether he—not the DEA—had any evidence in 1986 as to Zuno-Arce's involvement with the Cartel, Plaintiff Kuykendall answered truthfully that **he** did not have such evidence. *Id.* at lines 11-14.

77.     Defendants had access to all of this information about the 1990 *Zuno I* Trial, but they chose to ignore it. Instead, they deliberately presented a narrative utterly lacking in relevant context or factual support, and bookended by false commentary, calculated to falsely paint Plaintiff Kuykendall as having perjured himself to protect Zuno-Arce and the Cartel.

78.    The Show's onscreen text preceding the discussion of Plaintiff Kuykendall's trial testimony reads: "In court, Zuno-Arce's lawyer cross-examined a crucial witness. The witness was Kiki's boss – Jaime Kuykendall." [Ep. 4, 26:19] Following this text is a video clip of Plaintiff Kuykendall carrying a briefcase, walking outside the U.S. Consulate. The Show then excerpts snippets of Plaintiff Kuykendall's trial testimony, in a manner deliberately designed to mislead viewers:

> Kuykendall: "I would have to say that I didn't know anything, sir."
> Examiner: "There was no evidence that you knew of that he was a member of what has been called the Guadalajara Drug Cartel? That's true, too, sir, isn't it?"
> Kuykendall: "Not to my knowledge, no."
> Examiner: "You were supervisor to the Guadalajara Office?"
> Kuykendall: "Yes"
> Examiner: "What years?"
> Kuykendall: "From February of '82 until October of '85."
> Examiner: "And your basic job there was to find out who was dealing in drugs?"
> Kuykendall: "Yes."

[Ep. 4, 26:20-27:12]

79.    To make 100% sure that viewers are not confused by this snippet of testimony, but instead understand it consistently with the false narrative that Defendants spin, the Show follows this excerpt with a series of commentaries designed to falsely paint Kuykendall as a liar who perjured himself to protect Zuno-Arce and the Cartel and to sabotage Zuno-Arce's trial.

80.    Thus, Phil Jordan, a disgruntled former DEA agent featured in the Show, declaimed, "You have a DEA agent, who was the supervisor of Kiki Camarena, testify in

22

federal court that Zuno-Arce was really not in the dope business. I cannot believe that right there and then—That son of a bitch should've been out. He should not have been a DEA agent." [Ep. 4, 27:12-27:36] Mike Holm, another former DEA agent, stated in an interview for the Show, "He testified under oath in trial, and the assistant U.S. attorney was just apoplectic." [Ep. 4, 27:51-27:59]

81.     Similarly, Defendant Berrellez announced, "This is Kiki Camarena's supervisor, and he testifies to the fact that Ruben Zuno is not a drug dealer. We are shocked." [Ep. 4, 27:38-27:51] Berrellez further stated, concerning Plaintiff Kuykendall's testimony, "After he testifies, we take a little break. While we're in the elevator, Manny Medrano the AUSA, gets his briefcase and he slams it on the elevator floor and he says, 'Hector, take your gun out and shoot me right now. We're gonna lose this case. He's supposed to be on our side. He's Kiki's supervisor. He's gonna taint the whole jury.'" [Ep. 4 28:00-28:20]

82.     Each of these commentaries is designed to, and does, falsely portray Plaintiff Kuykendall as a saboteur and liar who, as Defendant Russell claimed in his letter, effectively testified "on behalf of" the Cartel.

83.     Defendants make no effort in the Show to explain that (1) Zuno-Arce was *convicted* at his 1990 trial; (2) the verdict was thrown out due to prosecutorial misconduct by AUSA Medrano; (3) Cervantes-Santos, a key government witness at the 1990 *Zuno I* Trial, later fully recanted his trial testimony, explaining that Medrano and Berrellez had given him a script and told him to implicate Zuno-Arce, promising him in return hundreds of thousands of dollars and sanctuary for his family; (4) Berrellez was investigated by OPR for his conduct with regard to coaching trial testimony at the 1990 *Zuno I* Trial; (5) at his subsequent retrial, at which Plaintiff Kuykendall did not testify,

Zuno-Arce was again convicted; and (6) Plaintiff Kuykendall's prior extensive testimony at the 1988 *Verdugo* Trial was instrumental in securing the convictions of multiple high-level Cartel operatives involved in Camarena's murder. Defendants knew all of this information and could have presented it to provide a truthful account of the 1990 *Zuno I* Trial. Instead, they manipulated the truth in order to defame Plaintiff Kuykendall.

### 2. An Unidentified Source Accuses An "Unnamed DEA Official"

84.     The concluding minutes of the final episode of the Show feature interview audio from an unidentified and unshown source, described as a "former Mexican official and Guadalajara Cartel member [who] recently approached Hector with new information about Kiki's murder," and whose "identity is being concealed" (the "Unidentified Source"). [Episode 4, 40:39-41:00.] Immediately prior to the audio of the Unidentified Source interview, onscreen text reads: "In the following call, the source alleged that a DEA official was complicit in Kiki's murder. The filmmakers have withheld the DEA official's name." [Ep. 4, 40:39-41:00]

85.     As Defendant Russell elucidated in his December 17 letter, the allegations of the Unidentified Source refer to Plaintiff Kuykendall, and despite redacting the name in the Show the reference to Plaintiff is obvious and unmistakable.

86.     In the interview audio, the Unidentified Source falsely and outrageously accuses Plaintiff Kuykendall, along with others in the DEA's Guadalajara Field Office, of having corruptly taken bribes from the Cartel, and of having been directly involved in planning and executing Camarena's kidnapping, including through his attendance at planning meetings and his alleged willingness to inform the Cartel as to Agent Camarena's movements and attire. The Unidentified Source also makes statements designed to convince viewers that Plaintiff Kuykendall's alleged involvement in the

Camarena murder was part and parcel of the broader conspiracy narrative that forms the basic premise of the Show, which is that Camarena was killed by the CIA in connection with a scheme to use proceeds of Cartel drug trafficking to finance the Contras in Nicaragua.

87.     The displayed text of the interview with the Unidentified Source reads:

Interviewer: "I would like to know, how and when did you meet [REDACTED]?[12]

Source: "I met him at the offices, the offices at the consulate. I personally accompanied the commander, Gabriel Gonzalez Gonzalez delivering money to him three different times. Those people were very, very generous to anyone who could serve them. When those people gave out money, they paid really well. I went to the consulate three times, to deliver briefcases for [REDACTED]. Directly to his hands."

Interviewer: "Are you 100% sure that it was [REDACTED]?"

Source: "Without a doubt, because there weren't many agents in that office. Kiki and [REDACTED] and a few others."

Interviewer: "And what about meetings planning the kidnapping?"

Source: "Well, I didn't attend all the meetings, just three of them. And in the last two meetings, I saw [REDACTED]."

Interviewer: "And what did [REDACTED] say?"

Source: "[REDACTED] made a plan with Verdugo, to signal how the man would be dressed, and what time he would leave."

Interviewer: "Who?"

Source: "Kiki...from the consulate."

Source: "Look. On another occasion, I was ordered to bring four million dollars to [REDACTED]. So he could share the money among his people. I don't know for sure, but I think that Kiki didn't want to take any money. So, they were afraid that he would report the bribes from the Narcos. And

---

[12] "[REDACTED]," for purposes of this complaint, indicates whited-out text shown on screen, the audio of which was also beeped out.

> they were scared he would talk about the ranch in Veracruz. Where they
> were trafficking the weapons and where they were training the Contras."
> Interviewer: "And why are you telling this story?"
> Source: "I don't want vengeance…All I want is justice."

[Ep. 4, 41:38-44:15]

88.     The interview with the Unidentified Source was conducted in Spanish. The Show included the Spanish audio with English subtitles overlaid. The English subtitles at certain points do not accurately reflect the questions and answers being played in Spanish. For example, the interviewer's first question, as translated on screen, reads: "I would like to know, how and when did you meet [REDACTED]?" However, a more accurate translation of the Spanish would be: "I would like to know, when and how did you meet the [REDACTED] of Kiki?" ("Me gustaría saber, cuando y como conoció al [REDACTED] de Kiki?"). [Ep. 4, 41:34-41:41] This rendition of the question makes it clear that the interviewer was referring to someone who had a relationship to Camarena, and in context there can be no doubt he is asking about Camarena's supervisor, Plaintiff Kuykendall—or as Phil Jordan said it, "the supervisor of Kiki."

89.     The Unidentified Source's false and outrageous accusations with respect to Plaintiff Kuykendall correspond directly with the false and scurrilous allegations raised by Russell in his December 17, 2019, letter to Plaintiff Kuykendall.

90.     But the Show does not stop with this presentation of false accusations leveled at Plaintiff Kuykendall by an unnamed "cartel insider" too cowardly to show his face. Instead, on-screen text following the recording of the Unidentified Source's voice, and concluding the Show, falsely claims that the corrupt former law enforcement officers whose interviews form much of the Show (Ramón Lira, Jorge Godoy, and René

Lopez, all discussed below) each corroborated the Unidentified Source's claims regarding Plaintiff Kuykendall's alleged presence at the planning meetings. These captions further falsely claim that Berrellez's reports of investigation from Operation Leyenda in the early 1990s memorialize these witnesses' corroborations. In reality, there is not an iota of evidence in any official report of the investigation into Camarena's murder—which is still open and ongoing—that in any way shows any suspicion of involvement by Plaintiff Kuykendall, or any other DEA agent for that matter.[13]

### B.   Deceptive and Lying Witnesses

91.   The Show primarily features interviews with four men—Defendant Berrellez and three witnesses he allegedly "developed" after he was brought onto Operation Leyenda in 1989. The three witnesses, referred to as "cartel insiders," are former Mexican police officers who defiled their uniforms and badges when they cowardly volunteered to serve the Guadalajara Cartel as government-credentialed bodyguards: Jorge Godoy, Ramón Lira, and René Lopez.

92.   The three dirty-cops/cartel-thug narrators in the Show "were closely tied" to Berrellez, who secured their expatriation to (and subsequent protection in) the United States, and who arranged to have them paid substantial stipends for their testimony. Moreover, these men were closely tied to each other, as colleagues and friends. During the Show, each of these men recounts, in gruesome detail and with little remorse, his own personal involvement in the cold-blooded and vicious torture and

---

[13] The statement that Plaintiff Kuykendall "made a plan with Verdugo, to signal how the man would be dressed, and what time he would leave" is particularly outrageous. As set forth above, Kuykendall testified extensively at Verdugo's 1988 trial and was instrumental in securing his conviction for complicity in Camarena's murder. If Plaintiff Kuykendall had conspired with Verdugo in the manner that the Unidentified Source slanderously states, Verdugo's counsel would most assuredly have raised this at his trial, whether in cross-examining Kuykendall or otherwise. No mention of this was made at Verdugo's trial, however, and Defendants knew this when they published the Unidentified Source's patently false accusation in the Show.

execution of Agent Camarena. Their agenda in participating in the Show is as clear as it is despicable: to deflect blame for Camarena's murder from them and their Cartel cronies to the American government.

93.      Jorge Godoy, a recurring narrator in the Show, is a brutal murderer and criminal. Godoy had once been an officer with the Jalisco State Police, and at the time of Camarena's murder he was also the personal bodyguard for Cartel kingpin Ernesto Fonseca-Carrillo. (Fonseca-Carillo was linked to, and later admitted to taking part in, the kidnapping and torture of Camarena, and was ultimately convicted by the Mexican courts and sentenced to forty years in prison.) Godoy was present in the house where Camarena was brutally tortured for over 30 hours and later murdered. Having the unmitigated temerity to appear in the Show wearing his old police uniform and badge, Godoy repeatedly and remorselessly admits to his complicity not only in Camarena's murder, but also in multiple other murders for the Cartel, including the kidnapping, torture, murder, and dismemberment of innocent American tourists. He also admits to having repeatedly used his badge to help Fonseca-Carrillo and other Cartel leaders get away with and cover up their crimes.

94.      René Lopez, another recurring narrator in the Show, is a butcher responsible for the murder of countless innocent people. He, too, was a Mexican police officer who repeatedly used his badge and his authority to protect Cartel kingpins like Fonseca-Carrillo rather than the people he had sworn to serve. In the Show, he admits, without the slightest contrition, that he was one of the men who physically abducted Agent Camarena – to whom he has the audacity to refer using his nickname, Kiki, as if the men were friends – and that he was present in the room where Camarena was tortured and murdered. He was also involved, along with Ramón Lira, in the 1984

kidnapping and murder of American missionaries in Guadalajara, whom certain Cartel leaders wrongly believed to be undercover DEA agents.

95.     Ramón Lira, another dirty cop and cold-blooded murderer, is also a recurring narrator in the Show. Not only was he Godoy and Lopez's boss, but he was also a bodyguard and facilitator for Cartel leadership including Fonseca-Carrillo. Lira was present where Agent Camarena was tortured and murdered, and was also directly involved in the 1984 kidnapping and murder of the American missionaries.

96.     Despite their criminal backgrounds, the Show presents the statements of these three men as the gospel truth, ignoring the fact that their reliability and credibility has been impugned on numerous occasions.[14] In a 2018 court filing, prosecutors shared summaries and assessments of recent interviews they had conducted with Godoy, Lira, and Lopez, in which the three men had given, in the words of one defense attorney, "never-before disclosed, incredible and contradictory" testimony purporting to relate to Camarena's murder.[15]

97.     Moreover, a 26-minute video uploaded to YouTube on September 18, 2020, by the account for Defendant Good Pixel, entitled "The Last Narc – Not Featured NEVER BEFORE HEARD TAPES," shows Berrellez coaching and correcting Godoy, Lira, and Lopez in their answers to the Show's interviews, and offering inaccurate translations and interpretations of their statements to the producers.[16] Additionally, as

---

[14] Brad Heath, "Killed by a cartel. Betrayed by his own? US reexamines murder of federal agent featured in 'Narcos'." USA Today, Feb. 28, 2020, https://www.usatoday.com/in-depth/news/politics/2020/02/27/enrique-camarena-dea-agent-murder-narcos-mexico/ 2566023001/ (last accessed Dec. 16, 2020).

[15] Id.

[16] GoodpixelProductions, "The Last Narc - Not Featured NEVER BEFORE HEARD TAPES." YouTube, Sept. 18, 2020, https://www.youtube.com/watch?v=htt-jJR-6I8&feature=youtu.be (last accessed Dec. 16, 2020). The caption for the video reads, "Tapes Never Before

previously alleged, Berrellez was investigated by the DEA for coaching witnesses to commit perjury in the Camarena murder trials and also for his orchestration of the unlawful abduction and rendition of Álvarez-Machaín in 1990.

## IV.   THE PROLIFERATION AND PERPETUATION OF DEFAMATORY STATEMENTS AS TO PLAINTIFF KUYKENDALL

98.     Since the release of the Show, and as a direct consequence of it, countless publications have contained reviews, commentaries, and discussions of the assertions made throughout the series, including the blatant falsehoods concerning Plaintiff Kuykendall. Despite the Show's half-hearted effort to "mask" Plaintiff Kuykendall's name in the final minutes of the series, viewers have no difficulty understanding, based on the overall context and content of the Show, that Plaintiff Kuykendall is the "unnamed DEA agent" accused by the Unidentified Source.

99.     Reviews for the Show on the Amazon Prime website reflect viewers' mistaken belief that the Show portrays the actual truth, and many such reviews document the understanding – uncontradicted by Defendants – that the "unnamed DEA agent" is Plaintiff Kuykendall. *See* Exhibit 8, attached. For example, on August 1, 2020 — the day after the Show's release — "Zola" posted a review with a caption that reads, "Is Kuykendall, Camarena's supervisor, the Cartel mole?" Under this header, Zola's review continued, "Many have done regrettable and harsh things in the service of their country. The brutal and savage murder of Enrique Camarena can not [sic] be accepted and ignored by the United States. Corruption and greed is just as strong and repugnant on both sides of the US, Mexican border."

---

Released Interview About Enrique 'Kiki' Camarena Filmed on location in California with Hector Berrellez, Ramon Lira, Jorge Godoy By John Massaria for Good Pixel Productions a subsidiary of "Sit Pixel Sit... Good Pixel Productions." [sic]

100.    Another reviewer, Chris Collier, replied to Zola, "I think Kuykendall took the bribe money, tried to disperse it amongst the team and Kiki refused. I think Kuykendall setup Kiki to have that lunch date with his wife in advance, or had advance knowledge of it and provided the cartel with the information and saw to it that Kiki stayed on schedule. I think Kuykendall is the inside traitor and the highest levels of the DEA and CIA knew this, encouraged it and helped to cover it up."

101.    As another example, viewers discussing the Show on a reddit.com page consider the Show to be "the truth," and also perceive and believe that the "unnamed DEA official" accused of taking cartel bribes is Plaintiff Kuykendall.[17] *See* Exhibit 9, attached. As Defendants clearly intended, viewers stitch together the various pieces that Defendants strategically scatter throughout the episodes to arrive at this false conclusion. In August 2020, one viewer of the Show posted to the reddit thread, quoted here *verbatim* (with multiple typographical and spelling errors),

> I personally think that the documentaty pretty much sats between the lines that the DEA agent is James Kuykendall They obviously cant say it directly but its not an accident that they mention his testimony in the same episode as that revelation They also show a video clip of him carrying a briefcase. This part might be me overanalyzing but i think its a hint by the producers to the viewers when they then not long after have the new witness say he brought suitcases of money to the unnamed dea agent. [*sic*]

102.    Multiple reddit posters in just this one thread and just in August 2020 arrived at the same conclusion, with another commenter stating, "Wow! This series was incredible. I expected a conspiracy theory-type show. But they backed everything up with archive footage and de-classified government documents."

---

[17] "The Last Narc (Amazon Prime) has been released, the Docu-Series about the death of Kiki Camarena Death," https://www.reddit.com/r/narcos/comments/i111tx/the_last_narc_amazon_prime_has_been_released_the/ (last accessed Dec. 17, 2020).

103.    Such online statements are not limited to statements made by third-party viewers not under Defendants' control. In fact, Defendants Berrellez, Russell, Massaria, and Good Pixel regularly participate in online discussions and give interviews wherein they perpetuate the lies in the Show, insist on the veracity of the conspiracies portrayed in the Show, and continue to deliberately attack Kuykendall and damage his reputation.

104.    On January 21, 2019, the YouTube account for Defendant Good Pixel, presumably through Defendant Massaria, uploaded a video edited by Massaria.[18] The video has now been viewed 4,172 times. Various viewers have commented in the ensuing two years, and the Good Pixel account replied (again presumably Defendant Massaria), directly engaging viewers in the online conversations. *See* Exhibit 10, attached. In one instance, Massaria replied at length, with various false and patently defamatory remarks concerning Mr. Kuykendall:

> it is being re-edited and Amazon assures us it will air soon – the CIA director Jack Lawn and corrupt agent Jaime Kuykendall have denied the witnesses testimony that James took a bag of cash at Fonsecas home the night before Kiki was snatched and killed- even though the body guards who were there all said he did in fact meet at the drug lords home and one them personally gave him the bag of money when testifying under oath and under a document if caught lying they (the witnesses) would be charged with his murder complicity- so by testifying these brave body guards risk everything- but James K and Jack (John) Lawn both said Hector Berrellez and the witnesses are lying- so they filed an injunction with Amazon to stop their names from being mentioned. The new edited version will omit their names. The story show omits how the Mena air fields in Arkansas were used under then Governor Clinton (at the time) helped Oliver North run drugs for the Iran Contra operation and where rebels were trained on US soil at that base. Hope this helps. There are many things not talked about – too many details I feel that are pivotal in portraying the absolute truth for history to judge. In the NTEFLIX show 'Narcos' Jaime Kuykendal as a hero is complete lie- he actually was kicked out of DEA one-two weeks after Kik's murder because he was obstructing

---

[18] GoodpixelProductions, "NARCOS, Kiki Camarena and the real truth Part 3 of 33 Edit 2." YouTube, Jan. 21, 2019, https://www.youtube.com/watch?v=40j1nFBBcSQ&lc=Ugy8stLjt8DVm-t8n3p4AaABAg.9BQek9aK-xi9BSvQV8LB_7 (last accessed Dec. 16, 2020).

> justice and drunk all the time – he was complicit in his murder and should
> be brought to justice. I met with Eric Newman and tried to explain this but
> they decided to use James instead of Hector to tell the story- thank god we
> never worked with NETFLIX Narcos and Eric Newman- he is a real
> coward telling the story the way he did- he completely made up the facts to
> suit the show instead of the real story which is so much more interesting.
> Hector Berrellez is a true hero. His real story will be told one way or
> another (maybe by book). Thanks for paying attention. [*sic*]

Defendant Massaria, through the Good Pixel account, further commented on YouTube,
referring to Defendant Berellez, "he is my closest friends and I love em." [*sic*] Massaria
also noted that he has "dozens of hours of interview footage with [Berrellez] and the
actual body guards [*sic*] for drug lords he protected." *See* Exhibit 10.

105.    Massaria's statements concerning Plaintiff Kuykendall in this YouTube
commentary are both outrageous and false. Plaintiff Kuykendall never took money from
any cartel operative or affiliate, never lied under oath, was not kicked out of the DEA (he
actually was promoted and remained in the DEA for four years, not two weeks, after
Agent Camarena's murder), and was not complicit in his friend's murder. Period.

106.    Commenting on another video[19] uploaded to YouTube by the Good Pixel
account on July 26, 2020, Defendant Massaria wrote,

> the truth remains that Kiki's boss James Kuykendall was the man who set
> up the kidnapping the night before at Fonescas [*sic*] house according to
> the two bodyguards who testified under-oath - I have the recordings where
> James was there taking a large bag of cash after the meeting.

When a commenter queried about those alleged recordings, clarifying that he was
inquiring about the Show, Defendant Massaria responded,

---

[19] Goodpixel Productions, "Rogue Narc Longest Gun Fight in DEA History Part 2 Full Story The Last Narc Amazon Prime." YouTube, Jul. 26, 2020, https://www.youtube.com/watch?v=S6s-TlLRPoc&feature=emb_logo (last accessed Dec. 16, 2020). Video caption reads, in part, "Edited + Filmed in NYC By John Massaria for Good Pixel Productions a subsidiary of "Sit Pixel Sit... Good Pixel Productions.'"

> I worked on the doc and with Hector for over 4 years- I am super close with Hector. I met with the sicarios when I stayed at Hectors home- They told me a lot on tape I dropped my jaw many times. Will I share those tapes of them telling me about James K? I wanted to as soon as Amazon released the doc - I called Hector and he said wait- new investigations are taking place as a result of the doc so he said wait.

Not only does Massaria explicitly and deliberately defame Plaintiff Kuykendall in these online comments, but he also makes clear that he intends to release purported recordings which likely contain additional lies and harmful assertions concerning Plaintiff Kuykendall. He also falsely suggests that Plaintiff Kuykendall is under some sort of investigation as a result of the publication of the Show.

107. Defendant Massaria also made false and defamatory statements concerning Plaintiff Kuykendall's testimony at the 1990 *Zuno I* Trial in comments he made on another of Good Pixel's YouTube videos (this video now has 7,664 views).[20] *See* Exhibit 10. After watching the Show, a viewer commented (with various errors),

> @GoodpixelProductions thanks once again , so many questions answered . But so many more questions raised , Kiki's friend and boss . Why would he testify that Zuno-Arce was not a drug dealer, and was he the Us consolite employee who pointed Kiki out to them the day the kidnapped him ? I hope there is more to this documentary and what off the tapes. [*sic*]

Massaria replied, "James Kuykendall also said Zuno wasnt a drug dealer under oath- he was Kiki's boss who set up Kiki - they all lie to protect their pockets and are sociopaths only out for personal gains $." These statements are false and defamatory and proliferate and perpetuate the lies and serious harm caused to Mr. Kuykendall.

---

[20] "NARCOS, Kiki Camarena and the real truth Part 2 of 33," Good Pixel Productions, Nov. 21, 2018, https://www.youtube.com/watch?v=0sbCiyN5OE0 (last accessed Dec. 16, 2020). While this video was uploaded in 2018, the quoted comments were posted after the release of the Show, "4 months ago" as of December 4, 2020.

**V.     Unauthorized Use of Plaintiff Kuykendall's Likeness and Misappropriation of his Identity**

108.   In the Show, Defendants include two audio recordings of Plaintiff Kuykendall's voice, along with photographs and video clips depicting him, from different and unknown sources.[21] But Defendants neither sought, nor received, nor had permission from Plaintiff Kuykendall to use his image, nor did they receive or have permission to use recordings of his voice, which he believes were created in an interview which was not taken by anyone affiliated with the development of the Show.

109.   The first episode of the series includes a fifteen-second clip of Plaintiff Kuykendall's voice, wherein he discusses, in general terms, his experience working out of the Guadalajara DEA Field Office. [Ep. 1, 21:30-22:45] The Show presents onscreen text identifying the voice thus: "Kiki's boss in Guadalajara was station chief Jaime Kuykendall." [Ep. 1, 21:24]

110.   The third episode of the series also includes an audio recording of Plaintiff Kuykendall's voice, 40 seconds long, in which he discusses the days following Agent Camarena's kidnapping. [Ep. 3, 19:37-20:17] While this audio recording of his voice plays, a video clip also runs, showing Plaintiff Kuykendall walking outside the field office with a briefcase in hand. No source or timeframe data accompanies this video clip, and Plaintiff Kuykendall is not aware of its origin.

111.   Defendants' use of Plaintiff Kuykendall's voice and image was deliberately designed to mislead viewers into believing that he was a willing participant in the Show or that he assented to the use of his voice. Indeed, Amazon's description of the Show on

---

[21] The Show also includes two images, both purportedly of the Mexican pilot whose body was discovered alongside Agent Camarena's—Captain Zavala. [Ep. 3, 13:56-14:07] At least the first of these images, which also depicts Kuykendall and Camarena, is not of Zavala but of another Mexican pilot, another example in the long list of misrepresentations in the Show.

its website, as well as the "x-ray" feature of its Prime Video platform, list Plaintiff Kuykendall as part of the Show's cast. Other prominent industry sources, such as IMDb.com (Internet Movie Database), list him as a cast member along with the various depicted video interviewees who presumably agreed to appear on the Show and were presumably paid for their participation.[22] IMDb is an Amazon-owned company.[23]

112.    A pre-release article published on July 30, 2020, states that the Show has "never-seen-before interviews" which "include those with Hector Berrellez, Geneva Camarena, Jorge Godoy, Phil Jordan, Ramón Lira, René Lopez, Manny Madrano [*sic*], Consuelo 'Chatita' Berrellez, **Jaime Kuykendall**, Mike Holm and Jim White."[24] Articles like this, undoubtedly promoted by Defendants, also cast the false impression that Plaintiff Kuykendall consented to his depiction in the Show. He did not.

## CAUSES OF ACTION

## COUNT I – DEFAMATION *PER SE*

113.    Plaintiff incorporates by reference, re-alleges, and adopts the preceding paragraphs of this Complaint as though fully set forth herein.

114.    Plaintiff Kuykendall brings this cause of action against all Defendants for defamation *per se* under Texas law and alleges that in publishing false and defamatory

---

[22] https://www.imdb.com/title/tt12163674/ (last accessed Dec. 16, 2020).

[23]    https://www.businessinsider.com/amazon-owned-imdb-is-close-to-announcing-a-new-streaming-service-2018-10 (last accessed Nov. 19, 2020).

[24] This article was published by MEAWW, which stands for "Media Entertainment Arts WorldWide," a self-described entertainment news company. Pooja Salvi, "'The Last Narc': Meet the real-life DEA undercover agent Kiki Camarena who risked everything to discover truth." MEAWW, Jul. 30, 2020, https://meaww.com/the-last-narc-real-life-dea-agent-kiki-camarena-amazon-prime-series-features-exclusive-interview-463371 (last accessed Dec. 16, 2020).

statements about Plaintiff Kuykendall in the Show and elsewhere, all Defendants acted with actual malice, and with knowledge or reckless disregard of the truth.

115.    False and defamatory material specifically concerning Plaintiff Kuykendall, published by Defendants, includes:

A.  Statements in the Show that Plaintiff Kuykendall gave false testimony at the first (1990) trial of Zuno-Arce that was designed to sabotage the trial and that was testimony he offered "on behalf of" the Cartel,

B.  Statements in the Show that Plaintiff Kuykendall took bribes from the Cartel, and was directly involved in planning and executing Camarena's kidnapping, including through his attendance at planning meetings and his alleged willingness to inform the Cartel as to Agent Camarena's movements and attire, and

C.  Statements by Defendants in online forums and commentaries accusing Plaintiff Kuykendall of dishonesty and criminal activity, including as to the matters described in A and B above.

116.    These false statements are defamatory *per se* under Texas law because they wrongly and without factual basis accuse Plaintiff Kuykendall of crimes, imputing to him a lack of integrity in his personal and professional life.

117.    Defendants' false representations and accusations of Plaintiff Kuykendall throughout the Show and elsewhere online degrade his good name, bring him into ill repute, and destroy confidence in his honesty and integrity, by wrongly asserting as historical fact but without proof or factual basis that Plaintiff Kuykendall has committed dishonest and illegal actions.

118.    The Show thus harms Plaintiff Kuykendall's reputation and good name, so as to lower him in the estimation of the community and deter third persons from associating or dealing with him, professionally and otherwise.

119.    Defendants' conduct has caused Plaintiff Kuykendall actual damages, including mental and physical suffering as well as reputational harm.

## COUNT II – DEFAMATION *PER QUOD*

120.    Plaintiff incorporates by reference, re-alleges, and adopts the preceding paragraphs of this Complaint as thought fully set forth herein.

121.    In the alternative to Count I, which alleges defamation *per se*, Plaintiff Kuykendall brings a cause of action for defamation against all Defendants pursuant to Texas Civil Practice and Remedies Code § 15.017.

122.    False and defamatory material specifically concerning Plaintiff Kuykendall, published by Defendants, includes:

> A.  Statements in the Show that Plaintiff Kuykendall gave false testimony at the first (1990) trial of Zuno-Arce that was designed to sabotage the trial and that was testimony he offered "on behalf of" the Cartel,
>
> B.  Statements in the Show that Plaintiff Kuykendall took bribes from the Cartel, and was directly involved in planning and executing Camarena's kidnapping, including through his attendance at planning meetings and his alleged willingness to inform the Cartel as to Agent Camarena's movements and attire, and

> C. Statements by Defendants in online forums and commentaries accusing Plaintiff Kuykendall of dishonesty and criminal activity, including as to the matters described in A and B above.

123.    Defendants' publications of these false statements are defamatory under Texas law because they portray or imply a lack of integrity in Plaintiff Kuykendall's life, especially in the false depiction of his purported beneficial relationship with drug traffickers, and in the outright or strongly suggested accusation that Plaintiff Kuykendall has committed dishonest and criminal actions. The falsehoods portrayed explicitly as well as implicitly in the Show tend to bring Plaintiff Kuykendall into ill repute, destroy confidence in his integrity, and harm him in his professional legacy and reputation.

124.    Defendants' production and publication of the Show has thus harmed and continues to harm Kuykendall's reputation, calling into question his integrity among his former colleagues and acquaintances, lowering him in the estimation of the community and public, and deterring third persons from associating or dealing with him.

125.    Defendants have acted, at minimum, negligently with regard to the falsity of the defamatory material published in the Show.

126.    Defendants' conduct has caused Plaintiff Kuykendall actual damages, including mental and physical suffering as well as reputational harm.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

127.    Plaintiff incorporates by reference, re-alleges, and adopts the preceding paragraphs of this Complaint as thought fully set forth herein.

128.    Defendants intentionally inflicted emotional distress upon Plaintiff Kuykendall when they acted with knowledge or with reckless disregard of the fact that

emotional distress would result from their false and outrageous accusations and portrayal of him in the Show. Defendants acted with intent and malice in publishing material they knew would impugn and diminish Plaintiff Kuykendall's lifelong dedication to law enforcement and public service by falsely and wantonly depicting him as a traitor-for-hire.

129.    Prior to the release of the Show, Plaintiff Kuykendall directly refuted to Defendants the false assertions made about him in the Show and demanded that they not publish them. Defendants thus knew that the release of the show would defame Plaintiff Kuykendall and inflict upon him extreme emotional distress, but they proceeded anyway, demonstrating the intentionality of their actions.

130.    The intentionally false and defamatory statements concerning Plaintiff Kuykendall included in the Show are extreme and outrageous in nature, and cross all bounds of human decency, intolerable in a civilized society.

131.    As a direct result of Defendants' intentional and despicable actions, including their false portrayal and accusations of him in the Show and in related publications, Plaintiff Kuykendall has suffered, and continues to suffer, severe emotional distress. Moreover, the stress caused by the release of the Show as well as by the related publications has triggered and/or exacerbated his health issues.

## **COUNT IV – VIOLATION OF PLAINTIFF'S RIGHT OF PUBLICITY**

132.    Plaintiff incorporates by reference, re-alleges, and adopts the preceding paragraphs of this Complaint as thought fully set forth herein.

133.    Defendants misappropriated Plaintiff Kuykendall's identity, and violated his right of publicity under Texas law, when they published audio recordings of his voice

and images of his person and name, without authorization, all for profit and for the value it adds to the Show.

134.    In the first audio recording of Plaintiff Kuykendall's voice, which appears in Episode 1 of the Show [21:30-22:43], Plaintiff Kuykendall is clearly identified by name and by coupling with a video clip, of unknown origin, which contains his image. In the second audio recording of Plaintiff Kuykendall's voice, which appears in Episode 3 of the Show [at 19:37], Plaintiff is again identified by name.

135.    These depictions of Plaintiff Kuykendall's voice and image, without his authorization, as well as the crediting of him as a "cast member" of the Show without authorization or compensation, exploit and misappropriate his identity for profit, and violate his right to publicity. The immense stress and mental suffering caused by this violation are exacerbated by the fact that his identity was appropriated and used to defame his name and character.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court summon Defendants to answer the allegations in this Complaint, and upon a trial by jury of this matter, enter judgment against Defendants AMAZON STUDIOS, HECTOR BERRELLEZ, JOHN MASSARIA, GOOD PIXEL PRODUCTIONS, TILLER RUSSELL, and THE INTELLECTUAL PROPERTY CORPORATION, jointly and severally, for:

A) all compensatory, statutory, economic, and other damages sustained by Plaintiff as a result of Defendants' actions;

B) all punitive and exemplary damages as may be allowable under applicable law;

C) both pre-judgment and post-judgment interest on any amounts awarded;

D) attorneys' fees, costs, and expenses, to the extent allowable by law;

E) equitable relief, including:

    a. a declaration of wrongdoing and/or a formal statement correcting the record as to Plaintiff Kuykendall;

    b. entry of a preliminary and permanent injunction prohibiting Amazon Studios from making *The Last Narc* in its current form available for streaming or available in any other medium, format, or method of transmission; alternatively, the entry of a preliminary and permanent mandatory injunction requiring Amazon Studios to edit the Show so as to delete, from any version made available for streaming or in any other medium, format, or method of transmission, all references to Plaintiff Kuykendall, express or implied, all depictions of Plaintiff Kuykendall's image or voice, and all defamatory and false references to the Show's discovery of "the truth";

    c. entry of a preliminary and permanent injunction prohibiting the release of any other versions of the Show or any interviews contained or referenced therein which contain defamatory statements, implicit or explicit, concerning Mr. Kuykendall; and

F) any such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable, and a trial pursuant to Rule 39(c) of the Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury to the extent permitted by law.

Dated: December 21, 2020  
     New York, New York

Respectfully submitted,

**DiCELLO LEVITT GUTZLER LLC**  
444 Madison Avenue  
Fourth Floor  
New York, New York, 10022

By: */s/ F. Franklin Amanat*  
F. Franklin Amanat, Attorney in Charge*  
Greg G. Gutzler*  
Bruce D. Bernstein*  
Megan E. McKenzie*  
(646) 933-1000  
famanat@dicellolevitt.com

*Counsel for Plaintiff James Kuykendall*

*Pending admission to SDTX bar.

*Of Counsel*:

W. Mark Lanier  
Alex J. Brown  
THE LANIER LAW FIRM  
10940 W. Sam Houston Pkwy. North  
Suite 100  
Houston, TX 77064  
(713) 659-5200  
wml@lanierlawfirm.com  
alex.brown@lanierlawfirm.com