# EXHIBIT 7

## Kuykendall Testimony
1990 Trial of Ruben Zuno Arce
Excerpted From Full Transcript
from June 08, 1990

1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - - - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CASE NO:  CR 87-422(F)-ER |
| | ) | |
| JUAN RAMON MATTA-BALLESTEROS | ) | |
| DEL POZO, RUBEN ZUNO-ARCE, | ) | |
| JUAN JOSE BERNABE-RAMIREZ, | ) | |
| AND JAVIER VASQUEZ-VELASCO, | ) | |
| | ) | |
| DEFENDANTS. | ) | VOLUME 15 |
| _____ | ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

FRIDAY, JUNE 8, 1990

LOS ANGELES, CALIFORNIA

JULIE CHURCHILL, CSR
SUSAN A. LEE, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 626-6353
(213) 617-8227

APPEARANCES OF COUNSEL:

      FOR THE PLAINTIFF:

            GARY A. FEESS,
            UNITED STATES ATTORNEY
            BY:  MANUEL A. MEDRANO
                 JOHN L. CARLTON
            ASSISTANT U.S. ATTORNEYS
            1200 UNITED STATES COURTHOUSE
            312 NORTH SPRING STREET
            LOS ANGELES, CALIFORNIA  90012
            (213) 894-0619/894-6682

      FOR DEFENDANT JUAN RAMON MATTA-BALLESTEROS DEL POZO:

            MARTIN R. STOLAR
            MICHAEL J. BURNS, ESQ.
            ADOLFO Z. AGUILAR, ESQ.
            ATTORNEYS AT LAW
            351 NORTH BROADWAY, 4TH FLOOR
            NEW YORK, NEW YORK  10013
            (212) 219-1919; (213) 855-8888 EXT. 314

      FOR DEFENDANT RUBEN ZUNO-ARCE:

            MITCHELL, SILBERBERG & KNUPP
            BY:  EDWARD M. MEDVENE, ESQ.
                JAMES BLANCARTE, ESQ.
                RONALD DI NICOLA, ESQ.
            11377 WEST OLYMPIC BOULEVARD
            LOS ANGELES, CALIFORNIA  90064-1683
            (213) 312-3150

      FOR DEFENDANT JUAN JOSE BERNABE-RAMIREZ:

            MARY KELLY
            ATTORNEY AT LAW
            827 MORAGA DRIVE
            BEL AIR, CALIFORNIA  90049
            (213) 472-7121
                AND
            BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.
            BY:  MICHAEL S. MEZA, ESQ.
            17050 BUSHARD STREET, STE. 200
            FOUNTAIN VALLEY, CALIFORNIA  92708
            (714) 898-0461; (213) 924-6606

APPEARANCES (CONTINUED):

       FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

           FEDERAL LITIGATORS GROUP
           BY:  GREGORY NICOLAYSEN, ESQ.
           8530 WILSHIRE BOULEVARD, STE. 404
           BEVERLY HILLS, CALIFORNIA 90211
           (213) 854-5135

ALSO PRESENT:

           DOUGLAS KUEHL, SPEC.AGT., D.E.A.
           HECTOR BERRELLEZ, SPEC.AGT., D.E.A.

           SPANISH INTERPRETERS

1  MAN AND WIFE TO THE PRESENT DATE?

2  A.   YES.

3        MR. MEDRANO:   THAT'S IT, YOUR HONOR.   THANK YOU.

4        THE COURT:   ALL RIGHT.   YOU MAY STEP DOWN.

5        (WITNESS EXCUSED.)

6        THE COURT:   CALL YOUR NEXT WITNESS.

7        MR. CARLTON:   THE GOVERNMENT CALLS JAMES KUYKENDALL.

8        (WITNESS SUMMONED TO THE COURTROOM.)

9

10     JAMES KUYKENDALL + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

11        THE CLERK:   PLEASE BE SEATED.   PLEASE STATE YOUR FULL

12  NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

13        THE WITNESS:   JAMES KUYKENDALL, K U Y K E N D A L L.

14

15                   DIRECT EXAMINATION +

16  BY MR. CARLTON:

17  Q.   MR. KUYKENDALL, DURING WHAT PERIOD WERE YOU EMPLOYED BY

18  THE D.E.A.?

19        THE COURT:   HAVEN'T WE BEEN THROUGH THIS BEFORE WITH

20  THIS WITNESS?

21        MR. CARLTON:   YES, YOUR HONOR.

22        THE COURT:   LET'S GET ON WITH WHY YOU CALLED HIM

23  AGAIN.

24  BY MR. CARLTON:

25  Q.   DRAWING YOUR ATTENTION TO AUGUST OF 1985, MR.

1   KUYKENDALL -- ACTUALLY, I'D LIKE YOU TO LOOK IN FRONT OF YOU AT

2   WHAT HAS BEEN MARKED AS EXHIBIT 75. DO YOU SEE THAT?

3   A.   YES, SIR.

4   Q.   HAVE YOU SEEN THOSE ITEMS BEFORE?  ACTUALLY LOOK AT THE

5   BROWN BAG OR BROWN ENVELOPE INSIDE.  WOULD YOU LOOK AT THAT.

6   A.   YES, SIR, I HAVE.

7   Q.   AND WHAT WAS THE OCCASION?

8   A.   THESE -- THE BROWN ENVELOPE WAS GIVEN TO ME BY MY

9   SECRETARY ON AUGUST THE 28TH 1985, AND I DELIVERED -- I CARRIED

10  IT TO WASHINGTON, D.C. AND DELIVERED TO IT SOMEONE THERE.

11  Q.   WHO WAS YOUR SECRETARY?

12  A.   MIRIAM ANGULO.

13  Q.   SHE WAS THE PERSON WHO GAVE THE BAG TO YOU?

14  A.   YES, SIR.

15  Q.   WHERE DID SHE GIVE IT TO YOU?

16  A.   THE D.E.A. OFFICE IN GUADALAJARA, MEXICO.

17  Q.   AT THE TIME SHE GAVE IT TO YOU, WAS IT SEALED?

18  A.   YES, IT WAS.

19  Q.   DID YOU FEEL ANYTHING INSIDE OF IT?

20  A.   THERE WAS SOMETHING INSIDE OF IT, YES.

21  Q.   WHAT DID YOU DO WITH THE ENVELOPE?

22  A.   I KEPT IT IN MY POSSESION.  I TRAVELED TO WASHINGTON, D.C.

23  ON THE 29TH OF AUGUST, AND ARRIVING LATE, I KEPT IT IN MY

24  POSSESSION THAT NIGHT, AND ON THE 30TH OF AUGUST, I WENT TO THE

25  D.E.A. HEADQUARTERS AND GAVE IT TO MR. MATTY MAHER.

1   Q.   IT REMAINED SEALED THE ENTIRE TIME?

2   A.   YES, SIR.

3   Q.   DID YOU SEE THE ENVELOPE OPENED AT THAT TIME?

4   A.   YES, I DID.

5   Q.   WERE THERE CASSETTE TAPES INSIDE?

6   A.   YES, THERE WERE.

7   Q.   WERE THOSE TAPES DENOMINATED COPIAS ONE THROUGH FIVE?

8   A.   YES, THEY WERE.

9   Q.   IS THE WORD COPIA IN ENGLISH COPY?  IS THAT WHAT THAT

10  MEANS?

11  A.   YES, IT IS.

12  Q.   DID YOU HAVE OCCASION TO LISTEN COPIAS TWO AND FOUR?

13  A.   YES, I DID.

14  Q.   HOW OFTEN DID YOU LISTEN TO THOSE?

15  A.   AT LEAST 40, 50 TIMES.

16  Q.   I WOULD ALSO AT THIS POINT LIKE YOU TO LOOK IN FRONT OF

17  YOU AT WHAT HAS BEEN MARKED AS EXHIBITS 78 AND 79.

18           I BELIEVE THE MARKINGS ARE INSIDE THE FIRST PAGE.

19  A.   YES, SIR.

20  Q.   DO YOU RECOGNIZE THOSE?

21  A.   YES, SIR, I DO.

22  Q.   WHAT ARE THEY?

23  A.   THEY ARE THE TRANSCRIPTION OF THE CASSETTE TAPES IN

24  SPANISH.

25  Q.   SPANISH TRANSCRIPTIONS?

1  A.   YES.

2  Q.   AND YOU'VE HAD OCCASION TO COMPARE THE SPANISH

3  TRANSCRIPTIONS TO THE CASSETTE TAPES?

4  A.   YES, I HAVE.

5  Q.   YOU'RE FLUENT IN SPANISH; ARE YOU NOT?

6  A.   YES, SIR.

7  Q.   ARE THESE ACCURATE TRANSCRIPTIONS OF COPIAS TWO AND FOUR?

8  A.   YES, THEY ARE.

9  Q.   LOOKING AT WHAT HAS BEEN MARKED AS EXHIBITS 80 AND 81, DO

10 YOU RECOGNIZE THOSE?

11 A.   YES, SIR.  YES, I DO.

12 Q.   WHAT ARE THEY?

13 A.   THEY'RE ENGLISH TRANSLATIONS OF THE SPANISH

14 TRANSCRIPTIONS.

15 Q.   HAVE YOU HAD OCCASION TO COMPARE THOSE ENGLISH

16 TRANSLATIONS TO THE SPANISH TRANSCRIPTIONS.

17       MR. STOLAR:  OBJECT TO THE CUMULATIVE NATURE OF THIS

18 TESTIMONY.

19       THE COURT:  SUSTAINED.

20 BY MR. CARLTON:

21 Q.   LOOKING AT WHAT HAS BEEN MARKED AS EXHIBITS 82 AND 83,

22 WOULD YOU, PLEASE.

23 A.   YES, SIR.

24 Q.   DO YOU RECOGNIZE THOSE?

25 A.   IF I COULD OPEN THEM UP?

1    Q.   YES, PLEASE.

2    A.   YES, I DO.

3    Q.   WHAT ARE THEY?

4    A.   THEY ARE THE VIDEO CASSETTES OF THE ENGLISH TRANSLATIONS.

5    Q.   ALL RIGHT.   THERE IS AN AUDIO PORTION TO THOSE CASSETTES

6    THAT YOU'VE JUST DISCUSSED; IS THAT RIGHT?

7    A.   YES, THERE IS.

8    Q.   WHAT DOES THE AUDIO PORTION CONSIST OF?

9    A.   THE SPANISH -- THE CASSETTE TAPES.

10   Q.   COPIAS TWO AND FOUR?

11   A.   YES, THEY ARE.

12   Q.   AND YOU HAVE LISTENED IN THEIR ENTIRETY TO EXHIBITS 82 AND

13   83?

14   A.   YES, I HAVE.

15   Q.   IS THERE A VIDEO PORTION TO THOSE EXHIBITS 82 AND 83?

16   A.   YES, THERE IS.

17   Q.   WHAT DOES THE VIDEO PORTION CONSIST OF?

18   A.   THE ENGLISH TRANSLATION.

19   Q.   THE VIDEO PORTION IS IDENTICAL TO THE ENGLISH

20   TRANSLATIONS, WHICH ARE EXHIBITS 80 AND 81?

21   A.   YES, SIR.

22   Q.   ALL RIGHT.   NOW, AS THE RESIDENT AGENT IN CHARGE OF THE

23   GUADALAJARA OFFICE, YOU SUPERVISED AGENT CAMARENA?

24   A.   YES, I DID.

25   Q.   YOU SOCIALIZED WITH HIM, AS WELL?

1   A.   YES, I DID.

2   Q.   YOU HEARD HIM SPEAK ON MANY OCCASIONS?

3   A.   YES.

4   Q.   DID YOU COME TO RECOGNIZE HIS VOICE?

5   A.   YES.  I WOULD.

6   Q.   HAVING LISTENED TO COPIAS TWO AND FOUR, DID YOU RECOGNIZE

7   ANYONE'S VOICE ON THOSE TWO TAPES?

8   A.   I RECOGNIZED THE VOICE OF ENRIQUE CAMARENA.

9   Q.   NOW, HAVING THEN READ THE SPANISH AND ENGLISH TRANSCRIPT

10   OF THOSE TWO COPIAS AND SEEING ENGLISH TRANSLATIONS ON THE TWO

11   VIDEOS, ARE THMOSE PORTIONS WHERE YOU HAVE RECOGNIZED AGENT

12   CAMARENA'S VOICE MARKED IN ANY WAY IN THE ENGLISH TRANSLATIONS?

13   A.   YES, THEY ARE.

14   Q.   HOW ARE THEY IDENTIFIED?  HOW ARE THEY IDENTIFIED IN THE

15   TRANSLATION AND ON THE VIDEOTAPE?

16   A.   WITH A LARGE CAPITAL LETTER C.

17   Q.   SO WHENEVER THE LETTER C APPEARS IN THE LEFTHAND MARGIN,

18   WILL WHAT FOLLOWS THAT BE A PORTION OF COPIA TWO OR COPIA FOUR

19   WHERE YOU HAVE IDENTIFIED AGENT CAMARENA'S VOICE?

20   A.   YES, SIR.  THE TRANSCRIPTS ARE IN QUESTION AND ANSWER FORM

21   AND THERE IS A CAPTAIN LETTER C FOR AGENT CAMARENA'S VOICE.

22   Q.   HAVING LISTENED TO THE TAPES, IS AGENT CAMARENA RESPONDING

23   TO QUESTIONS THROUGHOUT THOSE TAPES?

24   A.   HE IS RESPONDING TO QUESTIONS, YES.

25   Q.   NOW, IS THERE OTHER INFORMATION ON THOSE TWO COPIAS;

13-13

1   COPIAS TWO AND FOUR, INDICATING TO YOU THAT IT WAS AGENT

2   CAMARENA THAT WAS BEING QUESTIONED?

3   A.   YES.

4   Q.   AND AT SOME POINT ON THE TAPES DOES AGENT CAMARENA

5   DESCRIBE A HOUSE OWNED BY ERNESTO FONSECA?

6   A.   YES, HE DOES.

7   Q.   DOES HE PROVIDE DIRECTIONS TO THAT PARTICULAR HOUSE?

8   A.   YES, HE DOES.

9   Q.   DID YOU EVER HAVE OCCASION TO ACTUALLY FOLLOW THOSE

10  DIRECTIONS IN THE CITY OF GUADALAJARA TO SEE WHERE THEY WOULD

11  TAKE YOU?

12  A.   YES, I DID.

13  Q.   AND WHAT DID YOU DO IN THAT REGARD?   FIRST OF ALL --

14  STRIKE THAT.

15          WERE YOU FAMILIAR WITH THE HOUSE THAT AGENT CAMARENA

16  DESCRIBES ON THE TAPES?

17  A.   YES.

18  Q.   AND DO YOU RECALL WHERE THAT WAS LOCATED?

19  A.   AT THE CORNER OF TOPACIO AND CUARZO STREET.

20  Q.   WAS THIS A HOUSE ABOUT WHICH YOU HAD INFORMATION AT THE

21  TIME OF AGENT CAMARENA'S ABDUCTION?

22  A.   YES, IT WAS.

23  Q.   NOW, YOU HAD OCCASION THEN TO FOLLOW THE DIRECTIONS GIVEN

24  TO THAT HOUSE BY AGENT CAMARENA ON THESE TAPES?

25  A.   YES, I DID.

12

1    Q.   COULD YOU DESCRIBE EXACTLY WHAT YOU DID IN FOLLOWING THOSE

2    DIRECTIONS.  AND IN ORDER TO ASSIST IN THIS REGARD, I WOULD ASK

3    THE COURT'S PERMISSION FOR YOU TO BE ABLE TO STEP TO THE SIDE

4    TO THE CHART THAT HAS BEEN SET UP ON THE EASEL NEXT TO YOU.

5              THE COURT: YOU MAY DO THAT

6              THE WITNESS:   IN FOLLOWING THE DIRECTIONS  --

7              MR. MEZA:  MAY THE WITNESS REFER TO THE EXHIBIT NO.

8    YOUR HONOR?

9              MR. CARLTON:  THIS HAS BEEN MARKED AS EXHIBIT 84,

10   YOUR HONOR.

11             THE WITNESS:  THIS HAS EXHIBIT 78 ON IT.

12             MR. CARLTON:  ALL RIGHT.  THEN WE'LL CALL IT 78.

13             MR. STOLAR:  EXCUSE ME.  THERE ARE NOW TWO NUMBER 78S

14   IN EVIDENCE AND I DON'T THINK THAT'S A GOOD IDEA.

15             MR. CARLTON:  YOUR HONOR, MAY WE REMARK THAT 84?  I

16   THOUGHT IT WAS.

17             THE COURT:  YES, IT MAY BE REMARKED 84.

18             (WITNESS STEPPED DOWN TO THE EASEL.)

19             THE WITNESS:  I WOULD HAVE TO REFER TO THE

20   DIRECTIONS, AS THEY ARE GIVEN BY SPECIAL AGENT CAMARENA.

21             HE SAID TO TAKE THE STREET MARIANO OTERO AVENUE, THIS

22   STREET (INDICATING), AND GO THROUGH THREE TRAFFIC LIGHTS.  AT

23   THIS POINT ON THAT AVENUE AROUND A TRAFFIC CIRCLE, THERE ARE

24   THREE TRAFFIC LIGHTS.

25             HE THEN TELLS THE LISTENER TO TAKE THE LATERAL ALONG

1    MARIANO OTERO, WHICH IS THIS SIDE, UNTIL HE ARRIVES AT MANOLO'S

2    RESTAURANT AND TURN TO THE LEFT.  BECAUSE OF TRAFFIC LAWS IN

3    GUADALAJARA ON THAT AVENUE, THE ONLY PLACE YOU CAN MAKE A LEFT

4    TURN IS FROM THE LATERAL LANE.

5              AND THEN HE SAID TO PROCEED ON THE STREET CALLED

6    TOPACIO, AROUND THE TRAFFIC CIRCLE, AND GO AROUND THE TRAFFIC

7    CIRCLE, AND AFTER A LONG BLOCK, YOU ARRIVE AT THE HOUSE AT THE

8    CORNER OF TOPACIO AND CUARZO, WHICH WAS OWNED BY ERNESTO

9    FONSECA.

10   Q.   NOW, MR. KUYKENDALL, FOLLOWING THOSE SAME DIRECTIONS,

11   WOULD YOU ARRIVE AT THAT HOUSE IF YOU HAD DRIVEN ALONG MARIANO

12   OTERO FROM THE OPPOSITE DIRECTION?

13   A.   NO, SIR, BECAUSE HE'S EXPLICIT THAT YOU HAVE TO MAKE A

14   LEFT TURN.  YOU WOULD NOT HAVE BEEN ABLE TO MAKE A LEFT TURN

15   FROM THE OTHER DIRECTION.

16   Q.   I NOTICE THAT YOU STARTED FROM A PARTICULAR LOCATION ON

17   MARIANO OTERO.  WHY IS THAT?

18   A.   BECAUSE HE SAID YOU TAKE THREE TRAFFIC LIGHTS BEFORE

19   REACHING MANOLO'S.  IF HE HAD STARTED BEFORE THIS PARTICULAR

20   INTERSECTION, THERE IS A TRAFFIC LIGHT HERE.  A LITTLE FURTHER,

21   THERE IS A RAILROAD OVERPASS AND THEN OTHER TRAFFIC LIGHTS.

22              IF HE HAD STARTED BEYOND THIS, HE WOULD NOT HAVE GONE

23   THROUGH THREE TRAFFIC LIGHTS.

24   Q.   SO HAD YOU STARTED FROM ANY OTHER LOCATION ON MARIANO

25   OTERO, THOSE DIRECTIONS WOULD NOT HAVE TAKEN YOU TO THE HOUSE

1  HE WAS DESCRIBING?

2  A.  IT WOULD HAVE HAD TO HAVE BEEN SOMEPLACE IN THIS AREA,

3  YES.

4  Q.  WHAT IS THE SMALL STREET AT THE INTERSECTION WHERE YOUR

5  DIRECTIONS BEGAN?

6  A.  LOPE DE VEGA HITS THE LATERAL RIGHT ABOUT HERE.

7  Q.  THANK YOU VERY MUCH.  WOULD YOU RETURN.

8          (WITNESS RESUMED THE WITNESS STAND.)

9          NOW AT ANY POINT DURING THE PERIOD THAT YOU

10  SUPERVISED AGENT CAMARENA, DID HE EVER REPORT TO YOU THAT HE

11  HAD BEEN TO A RESIDENCE AT 881 LOPE DE VEGA?

12  A.  NO, SIR.

13  Q.  HAD HE BEEN TO THAT RESIDENCE IN PURSUIT OF HIS

14  INVESTIGATIONS, WOULD HE NORMALLY HAVE REPORTED THAT TO YOU?

15  A.  YES, SIR.

16  Q.  AT ANY TIME DURING THE PERIOD THAT YOU SUPERVISED AGENT

17  CAMARENA, DID HE EVER INFORM YOU THAT HE HAD BEEN INTERROGATED

18  BY NARCOTICS TRAFFICKERS?

19  A.  NO, SIR.

20  Q.  WOULD THAT HAVE BEEN THE KIND OF THING HE WOULD HAVE HAD

21  TO INFORM YOU OF IN THE COURSE OF HIS DUTIES?

22  A.  YES, IT WOULD HAVE BEEN.

23  Q.  IS THERE INFORMATION PROVIDED BY AGENT CAMARENA ON THE

24  TAPE -- WELL, STRIKE THAT.

25          MAY I HAVE JUST A MOMENT, YOUR HONOR?

15

1          (BRIEF PAUSE.)

2          AT SOME POINT ON THE TAPE DOES AGENT CAMARENA REFER

3     TO YOU?

4     A.   YES, HE DOES.

5     Q.   IN PARTICULAR, DOES HE REFER TO A FRIEND OF YOURS, AS

6     WELL, AS SOMEONE WHO HAS A MUNICIPAL POSITION IN MEXICO CITY?

7     A.   HE REFERS TO ME ON TWO SEPARATE OCCASIONS.  ON ONE

8     OCCASION IT IS SOMEONE WHO HAD A POLITICAL -- IT IS IN

9     REFERENCE TO SOMEONE WHO HAD A POLITICAL POSITION.

10    Q.   WAS YOUR ASSOCIATION WITH THAT INDIVIDUAL WELL KNOWN?

11    A.   NO, IT WAS NOT.

12    Q.   DID AGENT CAMARENA KNOW OF THAT?

13    A.   YES, HE DID.

14    Q.   ON THE TAPE, DOES AGENT CAMARENA PROVIDE DIRECTIONS TO THE

15    HOUSE OF AGENT VICTOR WALLACE?

16    A.   YES, HE DOES.

17    Q.   AGAIN, WAS THAT INFORMATION MAINTAINED IN STRICTEST

18    CONFIDENCE WITHIN THE D.E.A.?

19    A.   AS CLOSE AS POSSIBLE, YES, SIR.

20    Q.   DID AGENT CAMARENA KNOW OF THAT?

21    A.   YES, HE DID.

22    Q.   AT SOME POINT ON THESE TAPES ALSO, DOES CAMARENA DESCRIBE

23    THE --

24          MR. MEZA:   OBJECT TO THE LEADING NATURE OF THE

25    QUESTION.

16

1    THE COURT:  RESTATE YOUR QUESTION.

2  BY MR. CARLTON:

3  Q.   DOES AGENT CAMARENA EVER DESCRIBE THE OPERATIONS OF THE

4  GUADALAJARA OFFICE OF THE D.E.A. ON THESE TAPES?

5  A.   YES, HE DOES.

6  Q.   DO YOU RECALL WHAT HE SAID ABOUT THOSE OPERATIONS?

7  A.   I BELIEVE HE MADE REFERENCE TO THE NUMBER OF AGENTS

8  STATIONED AT THE OFFICE AND WHAT THEY WERE -- WHAT THEIR JOBS

9  WERE, WHAT THEY WERE ENGAGED IN AT THE TIME.

10 Q.   THE INVESTIGATIONS THEY WERE WORKING ON?

11 A.   YES.

12 Q.   WAS THAT INFORMATION ACCURATE?

13 A.   YES, IT WAS.

14 Q.   WAS THIS INFORMATION THAT WAS ALSO MAINTAINED WITHIN THE

15 STRICTEST CONFIDENCE WITHIN THE D.E.A.?

16 A.   YES, IT WAS.

17 Q.   DID AGENT CAMARENA HAVE ACCESS TO THAT INFORMATION?

18 A.   YES, HE DID.

19 Q.   AT SOME POINT ON THE TAPES DOES AGENT CAMARENA REFER TO A

20 PAYCHECK THAT HAD NOT BEEN DEPOSITED IN HIS ACCOUNT?

21 A.   YES, HE DID.

22 Q.   WHAT DOES HE SAY ABOUT THAT?

23 A.   THAT THE --

24    MR. MEZA:  OBJECTION, YOUR HONOR.  THE TAPE SPEAKS

25 FOR ITSELF.

1      THE COURT:  SUSTAINED.

2   BY MR. CARLTON:

3   Q.   WERE THESE STATEMENTS BY AGENT CAMARENA -- WELL, STRIKE

4   THAT.

5          BASED ON YOUR KNOWLEDGE OF AGENT CAMARENA, YOUR

6   KNOWLEDGE OF THE OPERATIONS OF THE D.E.A.'S GUADALAJARA OFFICE

7   DURING THE PERIOD, YOUR HAVING LISTENED TO THESE TAPES AND THE

8   INFORMATION CONTAINED ON THEM, DO YOU HAVE AN OPINION AS TO

9   WHAT THESE TAPES ARE, WHAT THEY RECORD?

10         MR. STOLAR:  OBJECTION.  NO BASIS FOR THAT OPINION.

11         THE COURT:  OBJECTION SUSTAINED.

12  BY MR. CARLTON:

13  Q.   DO YOU HAVE AN OPINION BASED ON THE INFORMATION ON THESE

14  TAPES AS TO WHEN THESE RECORDINGS WERE MADE?

15  A.   YES, I DO.

16  Q.   AND WHAT IS THAT OPINION?

17  A.   WITHIN A DAY OR TWO AFTER AGENT CAMARENA'S ABDUCTION.

18  Q.   AT SOME POINT DID YOU MEET WITH AN INDIVIDUAL NAMED RUBEN

19  ZUNO ARCE?

20  A.   YES, I DID.

21  Q.   WHEN WAS THAT?

22  A.   SEPTEMBER THE 26TH 1986.

23  Q.   WHERE DID YOU MEET WITH HIM?

24  A.   AT JIM'S RESTAURANT, NORTH SIDE OF SAN ANTONIO, SAN

25  ANTONIO, TEXAS.

1   Q.   DID MR.  -- DID SOMEONE ARRANGE THAT MEETING FOR YOU?

2   A.   YES.

3   Q.   WHO WAS THAT?

4   A.   EX-D.E.A. AGENT ART RODRIGUEZ.

5   Q.   WAS ANYONE ELSE PRESENT DURING YOUR MEETING WITH MR. ZUNO

6   ARCE?

7   A.   ART RODRIGUEZ.

8   Q.   NOW, DURING THAT MEETING WITH MR. ZUNO ARCE, DID YOU

9   DISCUSS THE RESIDENCE AT 881 LOPE DE VEGA?

10  A.   YES, I DID.

11  Q.   DID HE SAY WHETHER HE OWNED THAT RESIDENCE?

12  A.   HE SAID HE HAD OWNED IT, YES.

13  Q.   DID HE SAY WHEN HE HAD COME TO OWN THAT RESIDENCE?

14  A.   I BELIEVE THAT HE SAID HE ACQUIRED IT SOME 25 YEARS

15  PREVIOUSLY.  I THINK UPON HIS MARRIAGE.

16  Q.   DID HE INDICATE TO YOU FROM WHOM HE HAD ACQUIRED THE

17  RESIDENCE?

18  A.   IT WAS A GIFT FROM HIS MOTHER, I BELIEVE.

19  Q.   DID HE SAY WHEN HE ACQUIRED IT WHETHER THERE WERE ANY

20  BUILDINGS ON THE PROPERTY?

21  A.   THAT THERE WERE NO BUILDINGS ON THE PROPERTY.

22  Q.   AND DID HE SAY WHETHER HE HAD CONSTRUCTED OR HAD

23  CONSTRUCTED ANY BUILDINGS ON THE PROPERTY?

24  A.   HE HAD THEM CONSTRUCTED, YES.

25  Q.   DID HE DESCRIBE WHICH BUILDINGS HE HAD CONSTRUCTED?

15 01

1    A.    THE HOUSE.    I GUESS THE HOUSE AND OUT BUILDINGS AND THE

2    SWIMMING POOL.

3    Q.    DID HE INDICATE WHETHER HE HAD ACQUIRED OTHER PROPERTY

4    ADJACENT TO THE PROPERTY HIS MOTHER HAD GIVEN HIM AT THAT

5    LOCATION?

6    A.    HE SAID HE HAD ACQUIRED AN ADJOINING PIECE OF PROPERTY AND

7    HAD A TENNIS COURT BUILT ON IT.

8    Q.    NOW, DID MR. ZUNO ARCE TELL YOU WHETHER AT SOME POINT HE

9    HAD MOVED TO THE UNITED STATES?

10   A.    YES, HE DID.

11   Q.    DID HE SAY WHEN HE MOVED TO THE UNITED STATES?

12   A.    1978.

13   Q.    DID HE SAY WHETHER HE HAD LIVED IN THE UNITED STATES

14   DURING SOME PERIOD?

15   A.    FROM 1978 UNTIL 1982.

16   Q.    AND DID HE TELL YOU WHAT HE DID IN 1982?   DID HE RETURN TO

17   MEXICO?

18   A.    HE RETURNED TO MEXICO, YES.

19   Q.    DID HE TELL YOU WHAT HE DID WITH THE PROPERTY AT 881 LOPE

20   DE VEGA WHILE LIVING IN THE UNITED STATES?

21   A.    THAT HE HAD LEASED IT, RENTED IT.

22   Q.    DID HE TELL YOU DURING WHAT PERIOD HE CONTINUED TO RENT OR

23   LEASE THAT PROPERTY?

24   A.    I BELIEVE IT WAS LEASED UNTIL MAY OF 1984.

25   Q.    DID HE TELL YOU WHAT HAPPENED IN MAY OF 1984 WITH REGARD

1  TO THE PROPERTY?

2  A.   THE RENTER MOVED OUT AND HE HAD SOME REPAIRS DONE TO THE

3  HOUSE, AND I BELIEVE HE HAD IT REFURNISHED.

4  Q.   NOW, DID MR. ZUNO ARCE TELL YOU WHERE HE LIVED AFTER HIS

5  RETURN TO MEXICO IN 1982?

6  A.   I DON'T RECALL THAT, SIR.

7  A.   HE SAID HE STAYED IN THE HOUSE THREE OR FOUR TIMES.

8  Q.   THE HOUSE AT 881 LOPE DE VEGA?

9  A.   YES, SIR.

10  Q.   DID HE TELL YOU WHETHER HE EVENTUALLY SOLD THAT PIECE OF

11  PROPERTY?

12  A.   YES, HE DID.

13  Q.   WHAT DID HE SAY ABOUT THAT?

14  A.   HE SAID THAT HE SOLD THE PROPERTY TO A MR. RUBEN SANCHEZ

15  BARBA; THAT THEY MET, I BELIEVE, DECEMBER THE 22ND OF 1984 TO

16  DISCUSS THE SALE.

17  Q.   DID HE SAY WHEN THE SALE WAS ACTUALLY CONSUMMATED?

18  A.   THAT THEY HAD PLANNED TO MEET JANUARY THE 5TH OF 1985 TO

19  COMPLETE THE SALE, THE TRANSACTION, BUT THEY ACTUALLY MET ON

20  JANUARY 9TH OF 1985.

21  Q.   DID HE TELL YOU WHERE THEY MET?

22  A.   I SUPPOSE AT THE OFFICE OF NOTARY NUMBER ONE IN AMECA,

23  JALISCO.

24  Q.   AND DID HE INDICATE THAT THE TRANSACTION WAS FINALIZED AT

25  THAT TIME?

15 63

1   A.    THAT'S WHAT HE SAID.  YES, SIR.

2         MR. CARLTON:  YOUR HONOR, I WOULD MOVE AT THIS

3   TIME -- STRIKE THAT.

4         MAY I HAVE JUST A MOMENT?

5         (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

6         MR. CARLTON:  NOTHING FURTHER OF THIS WITNESS.

7         THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

8                CROSS-EXAMINATION +

9   BY MR. MEDVENE:

10  Q.    GOOD MORNING, MR. KUYKENDALL, SIR.

11  A.    GOOD MORNING.

12  Q.    MR. KUYKENDALL, IN AUGUST OF '86, SHORTLY BEFORE THE

13  OCCASION THAT YOU INTERVIEWED ZUNO ARCE, DID YOU OFFER THROUGH

14  ART RODRIGUEZ TO GO TO MEXICO TO TALK TO HIM?

15        MR. CARLTON:  OBJECTION, YOUR HONOR.  RELEVANCE AND

16  HEARSAY.

17        THE COURT:  OVERRULED.

18        THE WITNESS:  I REALLY DON'T RECALL, SIR.  MAYBE.

19  BY MR. MEDVENE:

20  Q.    DID YOU GET WORD FROM MR. RODRIGUEZ THAT MR. ZUNO WOULD BE

21  PLEASED TO COME TO THE UNITED STATES AND MEET WITH YOU?

22  A.    YES.

23  Q.    MR. RODRIGUEZ, AS YOU SAID, WAS A FORMER D.E.A. AGENT; IS

24  THAT CORRECT?

25  A.    YES, HE IS.

1   Q.   TO YOUR KNOWLEDGE, A FRIEND OF ENRIQUE CAMARENA?

2            MR. CARLTON:   OBJECTION, YOUR HONOR.   FOUNDATION AND

3   RELEVANCY.

4            THE COURT:   YOU MAY ANSWER.

5            THE WITNESS:   HE KNEW HIM.   YES, SIR.

6   BY MR. CARLTON:

7   Q.   NOW, YOU DIDN'T THREATEN MR. ZUNO IN ANY WAY THAT HE HAD

8   TO COME TO THE UNITED STATES, DID YOU?

9   A.   NO, SIR.

10  Q.   THERE WAS NO WARRANT OUT FOR HIS ARREST, WAS THERE?

11  A.   NO, SIR.

12  Q.   YOU ASKED IF HE WOULD COME AND HE VOLUNTARILY CAME TO MEET

13  YOU IN SAN ANTONIO; IS THAT TRUE?

14  A.   YES, IT IS.

15  Q.   NOW WHEN HE ARRIVED, HE SAID HE WOULD BE PLEASED TO ANSWER

16  WHATEVER QUESTIONS YOU HAVE; IS THAT CORRECT?

17  A.   HE DID.

18  Q.   HE DIDN'T REFUSE TO ANSWER ANY QUESTIONS.

19  A.   NO, SIR.

20  Q.   HE ANSWERED, TO THE BEST OF YOUR KNOWLEDGE, ALL YOUR

21  QUESTIONS FULLY?

22           MR. CARLTON:   OBJECTION, YOUR HONOR.   LACK OF

23  FOUNDATION.

24           THE COURT:   OVERRULED.

25           THE WITNESS:   HE ASKED (SIC) THE QUESTIONS I PUT TO

1    HIM, YES, SIR.  ANSWERED THE QUESTIONS.  I'M SORRY.

2    BY MR. MEDVENE:

3    Q.   BEFORE HE ANSWERED THE QUESTIONS, HE DIDN'T ASK FOR ANY

4    IMMUNITY, DID HE?

5    A.   NO, SIR.

6    Q.   HE DIDN'T ASK FOR ANY MONEY, DID HE?

7    A.   NO.

8    Q.   HE DIDN'T ASK TO RELOCATE HIS FAMILY, DID HE?

9    A.   NO.

10   Q.   YOU ASKED HIM QUESTIONS AND HE ANSWERED THEM?

11   A.   THAT'S CORRECT.

12   Q.   NOW, AT THE END OF THE INTERVIEW, MR. ZUNO TOLD YOU IN

13   SUBSTANCE THAT IF YOU WANTED ANYTHING FURTHER OF HIM TO, CALL

14   AND WE WOULD COME BACK AND BE OF WHATEVER ASSISTANCE HE COULD;

15   IS THAT CORRECT?

16   A.   I DON'T RECALL, BUT POSSIBLY SO.

17   Q.   YOU TOLD MR. ZUNO AT THE CONCLUSION OF YOUR MEETING THAT

18   HE COULD LEAVE AND RETURN TO MEXICO?

19   A.   THAT'S CORRECT.

20   Q.   AND YOU TOLD HIM HE COULD RETURN TO MEXICO BECAUSE BASED

21   ON YOUR OFFICE'S INVESTIGATION, THERE WAS NO EVIDENCE THAT

22   MR. ZUNO WAS IN ANY WAY INVOLVED IN THE KIDNAPPING OF ENRIQUE

23   CAMARENA; IS THAT CORRECT?

24   A.   I DON'T RECALL HAVING SAID THAT, SIR.

25   Q.   SIR, I'M ASKING YOU IF IT ISN'T TRUE THAT YOU -- NOT WHAT

1    YOU SAID TO HIM, BUT ISN'T IT TRUE THAT YOU PERMITTED HIM TO

2    RETURN TO MEXICO BECAUSE BASED ON YOUR OFFICE'S INVESTIGATION,

3    THERE WAS NO EVIDENCE HE WAS INVOLVED IN THE KIDNAPPING OF

4    ENRIQUE CAMARENA.  ISN'T THAT SO, SIR?

5            MR. CARLTON:  OBJECTIONION.   LACK OF PERSONAL

6    KNOWLEDGE.

7            THE COURT:  OVERRULED.

8    BY MR. MEDVENE:

9    Q.   THAT'S TRUE, ISN'T IT, SIR?

10   A.   I WOULD HAVE TO SAY I DIDN'T KNOW ANYTHING, SIR.

11   Q.   IN ADDITION, THERE WAS NO EVIDENCE THAT YOU KNEW OF THAT

12   HE WAS A MEMBER OF WHAT HAS BEEN CALLED THE GUADALAJARA DRUG

13   CARTEL?  THAT'S TRUE, TOO, SIR, ISN'T IT?

14   A.   NOT TO MY KNOWLEDGE, NO.

15   Q.   YOU WERE SUPERVISOR TO THE GUADALAJARA OFFICE?

16   A.   YES.

17   Q.   WHAT YEARS?

18   A.   FROM FEBRUARY OF '82 UNTIL OCTOBER OF '85.

19   Q.   AND YOUR BASIC JOB THERE WAS TO FIND OUT WHO WAS DEALING

20   IN DRUGS?

21   A.   YES.

22   Q.   HAD A MYRIAD -- LOTS OF INFORMANTS THAT SUPPLIED

23   INFORMATION, CORRECT?

24   A.   YES.

25   Q.   NOW, WITH RESPECT TO YOUR DISCUSSION WITH MR. ZUNO ABOUT

15

1   THE HOUSE, HE TOLD YOU, IN SUBSTANCE, THAT HE HAD INHERITED THE

2   PROPERTY MANY YEARS AGO FROM HIS MOM OR DAD?

3   A.   THAT IT HAD BEEN GIVEN TO HIM, RIGHT, BY HIS PARENTS.

4   Q.   YES, SIR.   THAT HE BUILT THE HOUSE THAT WAS ON THAT

5   LOCATION IN APPROXIMATELY 1970?

6   A.   I DON'T THINK HE TOLD ME THE DATE, BUT THAT HE HAD BUILT

7   THE BUILDING ON THE PROPERTY, THE HOUSE ON THE PROPERTY, YES.

8   Q.   MANY YEARS BEFORE?

9   A.   RIGHT.

10  Q.   THAT HE LEASED THE ENTIRETY OF THE PROPERTY TO AN

11  INDIVIDUAL WHO HE GAVE YOU HIS NAME FROM SOMETIME IN 1978 TO

12  APPROXIMATELY MAY OF '84?

13  A.   THAT IS CORRECT.

14  Q.   AND HE GAVE YOU THE PERSON'S NAME IN CASE YOU WANTED TO

15  CHECK WITH THAT PERSON?

16  A.   YES, HE DID.

17  Q.   HE TOLD YOU SUBSEQUENT TO MAY OF '84 THAT WHEN THE TENANT

18  LEFT, THAT HE MIGHT HAVE SLEPT AT THAT HOUSE ON THREE OR FOUR

19  OCCASIONS?

20  A.   THAT'S WHAT HE SAID, YES, SIR.

21  Q.   THAT SOMETIME IN OR ABOUT DECEMBER, HE SOLD THE HOUSE OR

22  ENTERED INTO A SALES ARRANGEMENT TO SELL THE HOUSE TO DR. RUBEN

23  SANCHEZ BARBA?

24  A.   YES, THAT'S RIGHT.

25  Q.   NOW, YOU KNEW FROM YOUR INVESTIGATION AT THE TIME YOU HAD

15

1  SEEN MR. ZUNO THAT AFTER RUBEN SANCHEZ BARBA ACQUIRED THE HOUSE

2  FROM MR. ZUNO, THAT SOMETIME IN MID JANUARY OF 1985 HIS BROTHER

3  JESUS ACTUALLY SHOWED THE HOUSE TO CARO QUINTERO; ISN'T THAT

4  TRUE?

5           MR. CARLTON:  OBJECTION, YOUR HONOR.  HEARSAY.

6           THE COURT:  SUSTAINED, UNLESS YOU CAN SHOW IT'S BASED

7  ON PERSONAL KNOWLEDGE.

8  BY MR. MEDVENE:

9  Q.   WAS THERE AN INVESTIGATION CONDUCTED, SIR, BY D.E.A.

10 AGENTS UNDER YOUR SUPERVISION OR THAT REPORTED GENERALLY TO YOU

11 WITH RESPECT TO THE RELATIONSHIP BETWEEN MR. JESUS SANCHEZ

12 BARBA AND CARO QUINTERO?

13 A.   NO, SIR.

14 Q.   ARE YOU AWARE OF ANY INTERVIEWS CONDUCTED BY THE D.E.A.

15 WHERE THEY QUESTIONED JESUS SANCHEZ BARBA ABOUT WHETHER OR NOT

16 AFTER HIS BROTHER OBTAINED THE HOUSE HE, JESUS, HAD SHOWN THE

17 HOUSE TO CARO QUINTERO?

18           MR. CARLTON:  OBJECTION, YOUR HONOR.   TO ANSWER THE

19 QUESTION, YOU HAVE TO GET IN HEARSAY AND THIS IS BEYOND THE

20 SCOPE OF THE DIRECT.

21           THE COURT:  OVERRULED.  THE QUESTION, THE FORM OF THE

22 QUESTION IS IMPROPER.  YOU SHOULD RESTATE YOUR QUESTION.

23           MR. MEDVENE:  YES, SIR.

24 BY MR. MEDVENE:

25 Q.   AS A RESULT OF YOUR OFFICE'S INVESTIGATION, MR.

1   KUYKENDALL, YOU WERE AWARE, WERE YOU NOT, THAT AT SOME POINT IN

2   TIME JESUS SANCHEZ BARBA WAS INTERVIEWED BY D.E.A. AGENTS?

3   A.   IT WAS NOT A RESULT OF MY OFFICE'S INVESTIGATION, SIR.

4   Q.   BUT IT WAS -- BUT THERE WAS A D.E.A. INTERVIEW OF JESUS

5   SANCHEZ BARBA, TO YOUR KNOWLEDGE, SOMETIME IN 1985; IS THAT

6   TRUE?

7   A.   I THINK SO, YES, SIR.

8            MR. CARLTON:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE,

9   LACK OF FOUNDATION.

10           THE COURT:  WELL, DO YOU THINK SO OR DO YOU KNOW?

11           THE WITNESS:  I'M NOT CERTAIN, SIR.  I DIDN'T

12   PARTICIPATE IN THAT.

13           THE COURT:  THEN THE ANSWER MAY BE STRICKEN.

14   BY MR. MEDVENE:

15   Q.   DO YOU KNOW A SPECIAL AGENT WILLIAM COONCE, C O O N C E?

16   A.   YES, I DO.

17   Q.   AND YOU KNOW THAT HE WAS WORKING OR ASSISTING IN VARIOUS

18   PHASES OF WHAT WE MIGHT CALL THE CAMARENA INVESTIGATION IN

19   1985; IS THAT CORRECT?

20   A.   I BELIEVE HE WAS THE HEAD OF THE INVESTIGATION.

21   Q.   AND YOU WERE VERY MUCH INVOLVED AS HEAD OF THE GUADALAJARA

22   OFFICE IN THE INVESTIGATION ALSO IN THE SPRING OF 1985.  THAT'S

23   CORRECT, ISN'T IT, SIR?

24   A.   THE SPRING OF '85, YES.

25   Q.   SO IF MR. COONCE IN MAY OF 1985 WOULD HAVE INTERVIEWED

1   JESUS SANCHEZ BARBA WITH RESPECT TO LOPE DE VEGA PROPERTY, IN

2   THE GENERAL COURSE OF EVENTS, THEY WOULD KEEP YOU ADVISED AS

3   HEAD OF THE GUADALAJARA OFFICE; ISN'T THAT TRUE?

4   A.   NOT PARTICULARLY, NO.   NOT THEN.

5   Q.   DO YOU REMEMBER AT SOME POINT BEING ADVISED THAT MR.

6   COONCE HAD SPOKEN TO JESUS SANCHEZ BARBA SOMETIME IN MAY OF

7   '85, AND JESUS SANCHEZ BARBA TOLD HIM THAT --

8           MR. CARLTON:   OBJECTION.   HEARSAY.

9           THE COURT:   SUSTAINED.

10  BY MR. MEDVENE:

11  Q.   WERE YOU AWARE OF ANY INFORMATION DEVELOPED IN THE COURSE

12  OF THE D.E.A.'S INVESTIGATION THAT THIS MAN JESUS SANCHEZ BARBA

13  AT SOME TIME AFTER HIS BROTHER ACQUIRED THE HOUSE IN JANUARY,

14  SHOWED IT TO RAFAEL CARO QUINTERO?

15          MR. CARLTON:   OBJECTION TO THE FORM OF THE QUESTION,

16  AND IT'S GETTING IN HEARSAY.

17          THE COURT:   COUNSEL, YOU SHOULD AVOID ASSERTING FACTS

18  IN YOUR QUESTION.

19          MR. MEDVENE:   YES, SIR.

20          THE COURT:   THE OBJECTION IS SUSTAINED.

21          MR. MEDVENE:   MAY I APPROACH THE WITNESS, YOUR

22  HONOR, FOR PURPOSES OF SHOWING HIM THE REPORT TO SEE IF IT

23  REFRESHES HIS RECOLLECTION?   A D.E.A. REPORT.

24          MR. CARLTON:   HE HASN'T TESTIFIED HIS RECOLLECTION

25  NEEDS REFRESHING.

1          THE COURT:  THE WITNESS NEEDS TO TESTIFY THAT HIS

2     RECOLLECTION NEEDS REFRESHING.

3          MR. MEDVENE:  I'D LIKE TO SHOW THE WITNESS THE REPORT

4     TO SEE IF HE RECALLS HAVING SEEN IT, YOUR HONOR.

5          THE COURT:  ALL RIGHT.

6     BY MR. MEDVENE:

7     Q.   I PLACED BEFORE YOU, SIR, A DOCUMENT THAT SAYS "PREPARED

8     MAY 17, 1985 BY WILLIAM R. COONCE AT WASHINGTON, D.C." IT IS A

9     ONE-PAGE DOCUMENT.

10         THE MARKS ON THERE, SIR, ARE MINE.  THE UNDERLINING

11    IS MINE.  I JUST ASK, SIR, IF YOU REMEMBER HAVING EVER SEEN

12    THAT DOCUMENT?

13    A.   NO, SIR.  I DON'T THINK I EVER SAW THE DOCUMENT.

14    Q.   DO YOU REMEMBER EVER RECEIVING FROM WHATEVER SOURCE ANY

15    INFORMATION -- IN THAT DOCUMENT, IN PARTICULAR, ANY INFORMATION

16    THAT MIGHT HAVE DEALT WITH JESUS SANCHEZ BARBA SHOWING THE

17    HOUSE TO CARO QUINTERO?

18    A.   YES, SIR.

19    Q.   AND ARE YOU REFRESHED NOW THAT IN THE COURSE OF YOUR

20    OFFICE'S INVESTIGATION, IT WAS ASCERTAINED THAT SOMETIME

21    SUBSEQUENT TO THE SALE OF LOPE DE VEGA HOUSE BY MR. ZUNO --

22         MR. CARLTON:  I'LL OBJECT WITHOUT A FOUNDATION, YOUR

23    HONOR, TO EVEN ASKING THE QUESTION ON THE GROUNDS THAT IT'S

24    IMPROPER FORM.

25         THE COURT:  LET'S HEAR THE QUESTION.

1    BY MR. MEDVENE:

2    Q.   LET ME TRY AGAIN.

3         ARE YOU REFRESHED NOW, SIR, THAT --

4         THE COURT:  HE DIDN'T LOOK AT THAT TO REFRESH

5    ANYTHING EXCEPT TO DETERMINE WHETHER HE RECALLED IT, WHETHER HE

6    RECALLED EVER HAVING SEEN IT.  THAT WAS THE PURPOSE FOR WHICH

7    YOU ASKED TO SHOW IT TO HIM.

8         MR. MEDVENE:  ALL RIGHT, SIR.

9    BY MR. MEDVENE:

10   Q.   IS IT TRUE, SIR, THAT AS A RESULT OF THE D.E.A.

11   INVESTIGATION, TO YOUR KNOWLEDGE, THEY ASCERTAINED THAT

12   SOMETIME AFTER THE HOUSE HAD BEEN SOLD BY MR. ZUNO, JESUS

13   SANCHEZ BARBA SOMETIME IN JANUARY OF 1985 SHOWED THE HOUSE TO

14   CARO QUINTERO?

15        MR. CARLTON:  OBJECTION.  LACK OF FOUNDATION.

16        THE COURT:  OVERRULED.  YOU MAY ANSWER.

17        THE WITNESS:  I BELIEVE THAT I LEARNED THAT A HOUSE

18   HAD BEEN SHOWN TO RAFAEL CARO QUINTERO.  I'M NOT CERTAIN THAT I

19   KNEW IT WAS JESUS SANCHEZ BARBA THAT SHOWED IT.

20   BY MR. MEDVENE:

21   Q.   DOES THAT DOCUMENT REFRESH YOUR RECOLLECTION THAT IT WAS

22   JESUS SANCHEZ BARBA THAT SHOWED IT?

23   A.   IT WAS A MEMBER OF THAT FAMILY, SIR, BUT THE NAME, I'M NOT

24   CERTAIN ABOUT THE NAME.

25   Q.   JESUS SANCHEZ BARBA OR A MEMBER OF HIS FAMILY; IS THAT

1   WHAT YOU'RE SAYING?

2   A.   YES, YES.

3   Q.   AND IS IT ALSO TRUE THAT YOU ASCERTAINED IN THE COURSE OF

4   YOUR INVESTIGATION THAT AFTER THAT MEETING, QUINTERO HAD TOLD

5   JESUS SANCHEZ BARBA THAT THE HOUSE --

6              MR. CARLTON:   OBJECTION.   HEARSAY.

7   BY MR. MEDVENE:

8   Q.   -- THAT THE HOUSE SHOULD BE REMODELED BEFORE HE WOULD BE

9   INVOLVED WITH THAT HOUSE?

10             MR. CARLTON:   I REITERATE THE HEARSAY OBJECTION, YOUR

11  HONOR.

12             THE COURT:   SUSTAINED.

13  BY MR. MEDVENE:

14  Q.   YOU DID ASCERTAIN, DID YOU NOT, SIR, IN THE COURSE OF YOUR

15  INVESTIGATION THAT SOMETIME AFTER THE SALE OF THE HOUSE BY

16  MR. ZUNO SOMETIME IN JANUARY, THERE WERE EXTENSIVE REPAIRS AND

17  REMODELING DONE TO THE LOPE DE VEGA HOUSE DONE THROUGH JESUS

18  SANCHEZ BARBA?

19             MR. CARLTON:   OBJECTION.   LACK OF FOUNDATION.   CALLS

20  FOR HEARSAY.

21             THE COURT:   OVERRULED.

22  BY MR. MEDVENE:

23  Q.   IS THAT TRUE, SIR?

24  A.   THE INVESTIGATION REVEALED THAT; I DIDN'T.

25  Q.   BUT THE INVESTIGATION REVEALED IT; IS THAT CORRECT, SIR?

1          MR. CARLTON:  OBJECTION.  MOVE TO STRIKE.

2          THE COURT:  OVERRULED.

3    BY MR. MEDVENE:

4    Q.   THE INVESTIGATION REVEALED THAT; IS THAT CORRECT?

5    A.   AS FAR AS I KNOW, YES, SIR.

6          MR. MEDVENE:  IF THE COURT PLEASE, THE WITNESS, I

7    UNDERSTAND, IS FROM A DISTANCE.  MAY I TAKE ONE MINUTE TO GO

8    OUTSIDE THE DIRECT FOR PURPOSES OF JUST INTRODUCING TWO

9    DOCUMENTS?

10          THE COURT:  IF IT'S BRIEF, I'LL PERMIT IT.

11          MR. MEDVENE:  YES, SIR.  IT WILL BE BRIEF.

12   BY MR. MEDVENE:

13   Q.   IN CONNECTION WITH THE ZACATECAS INVESTIGATION YOU TOLD US

14   ABOUT YOUR FIRST TIME HERE, YOU PREPARED OR CO-SIGNED ON

15   CERTAIN REPORTS; IS THAT CORRECT?

16   A.   YES, IT IS.

17   Q.   MAY I APPROACH, YOUR HONOR?  I APPROACH WITH WHAT HAS BEEN

18   MARKED G AND WHAT HAS BEEN MARKED H.

19          G, SIR, PURPORTS TO BE A DOCUMENT PREPARED JANUARY

20   13, 1984, SIGNED BY ENRIQUE CAMARENA AND YOURSELF.

21          AND LET'S TALK ABOUT THAT DOCUMENT FIRST AND THEN

22   WE'LL TALKING ABOUT H.  JUST BRIEFLY, WHAT IS G?

23   A.   IT IS A D.E.A.-6, WHICH IS A DRUG ENFORCEMENT

24   ADMINISTRATION REPORT OF INVESTIGATION, AND IT IS CONCERNING

25   THE LOCATION OF LARGE MARIJUANA FIELDS IN THE STATE OF

15-75

1   ZACATECAS, MEXICO, PREPARED AND SIGNED BY SPECIAL AGENT ENRIQUE

2   CAMARENA, AND I APPROVED IT.

3   Q.   DOES THAT PURPORT TO LIST SOME TEN GROUPS THAT WERE THE

4   CULTIVATORS OF MARIJUANA IN ZACATECAS IN 1984?

5          MR. CARLTON:   HEARSAY, YOUR HONOR.

6          THE COURT:   OVERRULED.

7          THE WITNESS:   IT IS A REPORT COMPILED OF INFORMATION

8   GIVEN TO US BY INFORMANTS THAT PURPORT TO CONTAIN MEMBERS OF

9   GROUPS OF CULTIVATORS IN ZACATECAS.

10  BY MR. MEDVENE:

11  Q.   YES.   AND YOU ALSO HAVE BEFORE YOU WHAT HAS BEEN MARKED H.

12  THAT'S WRITTEN IN LONGHAND.   IS THAT YOUR HAND?

13  A.   IT'S BLOCK LETTERS.   IT IS MY HANDWRITING.

14  Q.   WHAT DOES THAT PURPORT TO BE?

15  A.   THIS IS A HANDWRITTEN -- SEVERAL HANDWRITTEN PAGES OF

16  INFORMATION THAT I TURNED OVER TO THE MEXICAN AUTHORITIES

17  BEFORE THE RAIDS IN ZACATECAS IN MAY OF 1984.

18  Q.   WHAT DOES IT PURPORT TO LIST; THE FINANCIERS?

19  A.   THE FINANCIERS, FOREMEN, LOCATIONS, THEN SOME MORE

20  INFORMATION HERE ABOUT PEOPLE INVOLVED, AND SOME OF THE

21  GROWERS.

22          MR. MEDVENE:   THANK YOU, SIR.   I WOULD MOVE INTO

23  EVIDENCE G AND H, YOUR HONOR.

24          MR. CARLTON:   OBJECTION TO HEARSAY, YOUR HONOR.

25          THE COURT:   OBJECTION SUSTAINED.

1    BY MR. MEDVENE:

2    Q.   WITH RESPECT TO G, THE D.E.A. REPORT, A LISTING OF THE

3    MARIJUANA GROWERS, MR. ZUNO IS NOT LISTED; IS THAT CORRECT?

4              MR. CARLTON:  OBJECTION.  CALLS FOR A REPEAT --

5              THE COURT:  OVERRULED.

6    BY MR. MEDVENE:

7    Q.   IS THAT CORRECT?

8    A.   NO, HE'S NOT.

9    Q.   LET'S TALK ABOUT H, FINANCIERS, FOREMEN, WHATEVER ELSE YOU

10   SAID, HAVING TO DO WITH THESE DRUGS.

11             NO MR. ZUNO; IS THAT CORRECT?

12   A.   THAT IS CORRECT.

13             MR. MEDVENE:  THANK YOU, SIR.  NOTHING MORE, YOUR

14   HONOR.

15             THE COURT:  ALL RIGHT.

16             MR. MEDRANO:  MAY WE HAVE JUST ONE MOMENT, YOUR

17   HONOR?

18             THE COURT:  YES.  DO YOU HAVE SOME QUESTIONS OF THIS

19   WITNESS?

20                       CROSS-EXAMINATION +

21   BY MR. STOLAR:

22   Q.   JUAN RAMON MATTA OR MATTA BALLESTEROS' NAME IS ALSO NOT

23   LISTED AS BEING A GROWER OR FINANCIER IN CONNECTION WITH THE

24   THE MARIJUANA THAT FIELDS; IS IT?

25   A.   NO, SIR.

1  Q.   AND IN CONNECTION WITH THE ZACATECAS -- WELL, WITHDRAWN.

2       WHEN AGENT CAMARENA -- YOU SAY YOU SUPERVISED HIM; IS

3  THAT RIGHT?   THAT WAS YOUR DIRECT TESTIMONY HERE?

4  A.   YES, IT WAS.

5  Q.   WHEN HE WORKED ON CASES, HE PREPARED REPORTS; DID HE NOT?

6  D.E.A.-6'S, LIKE YOU'VE SPOKEN ABOUT?

7  A.   MOST OF THE TIME.

8  Q.   OKAY.  AND YOU WOULD CO-SIGN -- YOU WOULD BE THE APPROVER?

9  BOX 14 SAYS "APPROVED BY"; IS THAT RIGHT?

10 A.   YES.

11 Q.   ONE OF THE THINGS YOU WOULD CHECK WOULD BE TO MAKE SURE

12 THAT HE GOT THE CORRECT FILE TITLE AND FILE NUMBER AND THINGS

13 OF THAT NATURE?

14 A.   YES, SIR.

15 Q.   AND THESE REPORTS OF DIFFERENT INVESTIGATIONS ALL HAD

16 DIFFERENT FILE TITLES, OR SOME OF THEM DID; IS THAT RIGHT?

17 A.   YES.

18 Q.   FOR EXAMPLE, THE FILE COULD BE CALLED JUAN JOSE QUINTERO

19 PEYEZ, ET AL., AND THAT WAS ONE CASE, IS THAT RIGHT?

20 A.   IT COULD BE.

21 Q.   OTHER FILES COULD BE DONE CALLED "OPERATION CHICKLET"; IS

22 THAT RIGHT?

23 A.   YES.

24 Q.   CAN YOU TELL US BY YOUR MEMORY, IF YOU HAVE, THE DIFFERENT

25 FILE NAMES, DIFFERENT FILE TITLES OF THE CASES THAT WERE WORKED

15-76

1    ON BY AGENT CAMARENA?

2            MR. CARLTON:  OBJECTION, YOUR HONOR.  BEYOND THE

3    SCOPE AND LACK OF RELEVANCE.

4            MR. STOLAR:  IT'S PERFECTLY RELEVANT.

5            THE COURT:  OVERRULED.

6            THE WITNESS:  I CANNOT POSSIBLY REMEMBER ALL THE FILE

7    TITLES, SIR.

8    BY MR. STOLAR:

9    Q.  IF I SHOWED YOU A NUMBER OF AGENT CAMARENA'S 6'S THAT YOU

10   CO-SIGNED WHICH, UNFORTUNATELY, HAVE THE FILE TITLES BLACKED

11   OUT ON THEM, DO YOU THINK THAT MIGHT HELP YOU REMEMBER SOME OF

12   THEM?

13           THE COURT:  IT MIGHT.

14           MR. STOLAR:  WITH YOUR PERMISSION, JUDGE.

15           THE COURT:  ALL RIGHT.

16           (DOCUMENTS TENDERED TO THE WITNESS.)

17   BY MR. STOLAR:

18   Q.  AS YOU GO THROUGH, IF YOU WOULD, IF ONE OF THEM JUMPS OUT

19   AT YOU, STATE THAT.

20           (WITNESS REVIEWING DOCUMENTS.)

21   A.  WELL, THERE ARE SEVERAL DIFFERENT CASES.

22   Q.  SEVERAL DIFFERENT CASES?

23   A.  YES.

24   Q.  DO YOU REMEMBER ANY OF THE TITLES?

25   A.  I BELIEVE ONE OF THEM WOULD HAVE BEEN ENTITLED "MANUEL

1   CHAVEZ".

2   Q.   RIGHT.

3   A.   I BELIEVE THAT THIS ONE WAS PROBABLY ENTITLED "RAFAEL CARO

4   QUINTERO".

5           THERE ARE A COUPLE HERE THAT I CANNOT RECALL EXACTLY

6   WHAT THE FILE TITLE WOULD HAVE BEEN.

7   Q.   BUT IT WOULDN'T BE ONE OF THE FOUR THAT YOU KNOW ABOUT,

8   RIGHT, IT WOULD BE SOMETHING DIFFERENT THAN THE ONES WE KNOW

9   ABOUT NOW.  OPERATION CHICKLET, JUAN JOSE QUINTERO PEYEZ,

10  RAFAEL QUINTERO, AND SO FORTH.  WE HAVE IDENTIFIED FOUR

11  DIFFERENT FILE TITLES?

12  A.   I THINK I IDENTIFIED TWO FOR YOU.  I DID ACTUALLY IDENTIFY

13  TWO FOR YOU.

14  Q.   OKAY.

15          THE COURT:  WE'LL TAKE OUR NOON RECESS AND THE

16  WITNESS CAN LOOK OVER THESE EXHIBITS AND YOU CAN RESUME YOUR

17  QUESTIONING AT 1:30.

18          THE CLERK:  PLEASE RISE.

19          (JURY EXCUSED.)

20          (COURT STANDS IN RECESS UNTIL 1:30 P.M.)

21

22

23

24

25

1    LOS ANGELES + CALIFORNIA, FRIDAY, JUNE 8, 1990

2                      + 1:30 P.M.

3         (JURY ABSENT:)

4         THE COURT:  LET THE RECORD SHOW THE COURT HAS CONVENED

5    OUTSIDE THE PRESENCE OF THE JURY WITH ALL COUNSEL AND

6    DEFENDANTS PRESENT.

7         MR. MEDVENE:  THANK YOU VERY MUCH, YOUR HONOR.

8         THE COURT:  THIS BETTER BE GOOD.

9         MR. MEDVENE:  YES.

10        THE COURT:  WHAT IS THE NEED FOR THIS?

11        MR. MEDVENE:  THE GOVERNMENT JUST GAVE US, WITHIN THE

12   LAST FIVE MINUTES, A TWO-PAGE DOCUMENT THAT THEY INDICATED MR.

13   KUYKENDALL HAD IN HIS FILE THAT HAS A LIST OF NAMES THAT THEY

14   INDICATED MR. KUYKENDALL WROTE OUT IMMEDIATELY AFTER THE --

15        THE COURT:  WILL YOU GET TO THE POINT.

16        MR. MEDVENE:  IMMEDIATELY AFTER THE ABDUCTION.

17        THE COURT:  YES.

18        MR. MEDVENE:  IT HAS MR. ZUNO'S NAME IN IT.  WE HAD

19   NEVER HAD THAT.

20        THEY TOLD US THE BASIS FOR THAT WAS THAT IN 1982,

21   THERE WAS INCIDENT UNRELATED TO THIS CASE ABOUT AN AIRCRAFT, OR

22   AN AIRCRAFT COMING IN FROM TEXAS.  AND THEY TOLD US THAT THEY

23   INTENDED, IF YOUR HONOR PERMITTED, TO GET INTO THE FACT THAT

24   MR. KUYKENDALL HAD MADE UP -- EVEN THOUGH HE'S TESTIFIED ON THE

25   STAND THAT IN 86 THERE WAS NO EVIDENCE AGAINST MR. ZUNO, THAT

1   HE MADE UP A LIST OF SUSPECTS, WHICH IS A HEARSAY LIST.  HE
2   MADE THIS UP IN 85 SOMETIME.

3         I WOULD SAY, YOUR HONOR, THAT THEY SHOULD NOT BE
4   PERMITTED TO ASK QUESTIONS ABOUT THIS LIST, BECAUSE IT'S NOT
5   ONLY HEARSAY, BUT THE TIMING OF TRYING TO GET INTO OR FORCING
6   US TO GET INTO SOME INCIDENT IN 82 HAVING TO DO WITH A PLANE IS
7   NOT RELEVANT.  IT'S NOT RELEVANT BECAUSE MR. KUYKENDALL HAS
8   ALREADY TESTIFIED THAT THEY HAD NO EVIDENCE.

9         ALL WE ASKED ABOUT WAS, IN 86:  DID YOU HAVE ANY
10  EVIDENCE AGAIN HIM?

11        AND HE SAID, "WE HAD NO EVIDENCE AGAINST HIM."

12        SO IT WOULD BE HIGHLY PREJUDICIAL AND MISLEADING,
13  WHETHER HE WAS EVER A SUSPECT OR NOT.  I THINK THEY HAD NO
14  EVIDENCE AGAINST HIM IN 86.

15        SO IT'S NOT RELEVANT ON THE TIME PERIOD, IT'S A
16  HEARSAY STATEMENT, IT'S THE FIRST TIME WE'VE GOTTEN THESE
17  D.E.A. REPORTS, YOUR HONOR, DATED FEBRUARY 26 OF 82, HAVING TO
18  DO WITH MR. ZUNO AND HIS PLANE AND COMING BACK AND FORTH INTO
19  THIS COUNTRY, HAVING NOTHING TO DO WITH THIS INCIDENT --

20        THE COURT:  COUNSEL, YOU'RE RAMBLING.  I HAVE NO IDEA
21  WHAT YOU'RE TALKING ABOUT.

22        MR. CARLTON:  MAY I EXPLAIN, YOUR HONOR?

23        THE COURT:  YES, PLEASE EXPLAIN.

24        MR. CARLTON:  WHAT COUNSEL IS TALKING ABOUT IS A
25  HANDWRITTEN LIST PREPARED BY MR. KUYKENDALL IN FEBRUARY OF

1  1985, JUST JOTTING DOWN IDEAS ABOUT THE CAMARENA INVESTIGATION,

2  INCLUDING NAMES OF SOME PEOPLE HE THOUGHT MIGHT BE SUSPECTS.

3  INCLUDED ON THAT LIST IS THE NAME RUBEN ZUNO ARCE.

4          NOW, THIS IS THE DOCUMENT THAT WAS MAINTAINED IN MR.

5  KUYKENDALL'S PERSONAL FILES ALL THIS TIME.

6          THIS INFORMATION WAS NOT ELICITED ON DIRECT TESTIMONY

7  FROM MR. KUYKENDALL, NOR ON HIS RECALLING TODAY. WE BELIEVE

8  THAT IT WAS OPENED UP AGAINST OUR OBJECTIONS WHEN MR. MEDVENE

9  INQUIRED AS TO WHETHER THERE WAS ANY EVIDENCE THAT MR. CAMARENA

10 WAS A SUSPECT.

11         MR. MEDVENE:  NO, I DIDN'T ASK THAT QUESTION.

12         THE COURT:  JUST A MOMENT.

13         MR. CARLTON:  I'M SORRY:  MR. ZUNO WAS A SUSPECT IN

14 MR. CAMARENA'S ABDUCTION.

15         NOW, IN ORDER FOR THAT TO STAND -- THAT IS MISLEADING

16 IN LIGHT OF THE EVIDENCE THAT WE HAVE HERE THAT IN FACT --

17         THE COURT:  JUST A MINUTE.

18         MR. CARLTON:  YES.

19         THE COURT:  I THINK THAT I CAN RESOLVE THIS.

20         THE DOCUMENT THAT WAS REFERRED TO EARLIER BY THIS

21 WITNESS AND ABOUT WHICH HE WAS QUESTIONED RELATED SPECIFICALLY

22 AS TO THE ZACATECAS MARIJUANA FIELDS, WHICH IS A PART OF THE

23 HEART OF YOUR CASE HERE, THAT THE TAKING OVER OF THAT FIELD AND

24 THE DESTRUCTION OF IT FORMED THE RETALIATORY MOTIVE OF THE

25 DEFENDANTS AND THE DEFENDANTS' -- AND THIS CARTEL TO RETALIATE

15-83

1   OR, RATHER, TO GET EVEN AND TO RETALIATE AGAINST THE D.E.A. AND

2   MR. CAMARENA.

3          BECAUSE IT'S WHAT IT IS, I THINK IT WAS APPROPRIATE

4   FOR THE DEFENSE COUNSEL TO ELICIT THE FACT THAT, OF THE PEOPLE

5   DESIGNATED ON THAT LIST, THAT HIS CLIENT'S NAME WAS NOT ON IT.

6          NOW, WHAT YOU'RE OFFERING IS A SUSPICION BY THIS

7   WITNESS.  YOU COULD NOT ASK HIM DIRECTLY IF HE SUSPECTED MR.

8   ZUNO.  THAT IS AN IMPROPER QUESTION.  IF YOU HAD EVIDENCE

9   AGAINST HIM, YES.

10         THIS LIST THAT YOU'RE TALKING ABOUT YOU SAY IS A LIST

11  OF SUSPECTS THAT HE BELIEVED MIGHT BE INVOLVED.

12         MR. CARLTON:  WELL, THERE'S A BASIS FOR HIS BELIEF.

13         THE COURT:  WHAT?

14         MR. CARLTON:  THERE'S A BASIS FOR HIS BELIEF, YOUR

15  HONOR.

16         THE COURT:  THEN YOU CAN PRODUCE THE BASIS AND

17  INTRODUCE THAT, BUT I DON'T THINK THAT YOU CAN INTRODUCE THE

18  FACT THAT HE WAS A SUSPECT IN THIS WITNESS'S MIND.

19         MR. CARLTON:  WELL, THE WITNESS HAS TESTIFIED IN

20  RESPONSE TO MR. MEDVENE'S CROSS-EXAMINATION THAT THERE WAS NO

21  EVIDENCE THAT MR. ZUNO WAS A SUSPECT IN THE CAMARENA --

22         MR. MEDVENE:  I DIDN'T ASK THAT QUESTION, JUDGE.  I'LL

23  TELL YOU --

24         MR. CARLTON:  OH, YES, HE DID.

25         THE MEDVENE:  -- I ASKED, "DID YOU HAVE EVIDENCE THAT

15-84

1   HE WAS INVOLVED IN THE PLANNING OF CAMARENA?" (AS STATED.)   AND

2   THE WITNESS SAID NO.

3          THAT HAS NOTHING TO DO WITH THIS.

4          THE COURT:  ALL RIGHT.  THE OBJECTION WILL BE

5   SUSTAINED.

6          MR. MEDVENE:  THANK YOU, YOUR HONOR.

7          EXCUSE ME.  THERE'S ONE MORE QUESTION THAT WE WANT TO

8   ASK.

9          WE UNDERSTAND -- AND WE ASK WITH DUE DEFERENCE TO ONE

10  OF THE DEFENSE COUNSEL, BUT -- THAT HE WAS GOING AS TO ASK,

11  "DID YOU MAKE A LIST UP OF SUSPECTS TO SHOW THAT MATTA'S NAME

12  WASN'T MENTIONED?"

13         I APOLOGIZE TO DEFENSE COUNSEL.

14         WE DON'T THINK COUNSEL SHOULD ASK:  DID HE MAKE A LIST

15  UP?

16         IF COUNSEL WANTS TO ASK, "WAS MATTA A SUSPECT IN 82?",

17  WE OBVIOUSLY HAVE NO CONCERN WITH THAT; BUT NOT IF HE MADE UP A

18  LIST, BECAUSE AFRAID IT WILL OPEN UP THIS LIST, AND THAT'S

19  IMPROPER.

20         SO WE'RE ASKING NOW --

21         MR. STOLAR:  I HAD INTENDED AND DO INTEND TO ASK THE

22  WITNESS WHETHER, SHORTLY AFTER AGENT CAMARENA DISAPPEARED, DID

23  THE WITNESS JOT DOWN IN PERSONAL NOTES THAT LIST OF POSSIBLE

24  SUSPECTS AND POSSIBLE PLACES TO GO LOOK.  I EXPECT THE ANSWER

25  TO THAT WILL BE YES.

15-85

1       I WILL THEN ASK HIM, "MR. MATTA'S NAME IS NOT ON THAT

2   LIST, IS IT?"

3       I EXPECT THE ANSWER TO BE NO.

4       THAT'S THE TWO QUESTIONS I INTEND TO ASK.

5       MR. MEDVENE:  IF THAT'S OTHERWISE PROPER, IT SEEMS TO

6   ME ALL THAT COUNSEL HAS TO ASK IS, "DID YOU HAVE IN MIND A

7   LIST, AND WAS MR. MATTA'S NAME ON IT? "

8       THE COURT:  THE QUESTIONS HE'S GOING ASK ARE

9   APPROPRIATE.

10      MR. CARLTON:  NOW, ONE LAST POINT, YOUR HONOR.

11      I ANTICIPATE -- MAYBE MR. MEDRANO CAN TELL ME IF MY

12  INFORMATION IS INCORRECT -- THAT ON CLOSING ARGUMENT THEY'RE

13  GOING TO SEEK TO ARGUE THAT MR. ZUNO ARCE WASN'T EVEN A SUSPECT

14  UNTIL 89, THAT HE WAS QUESTIONED BY MR. KUYKENDALL IN SEPTEMBER

15  OF 1986 AND LET GOT BECAUSE NO ONE HAD ANY EVIDENCE OR

16  SUSPICIONS AGAINST HIM.

17      AND THE POINT OF ALL OF THIS IS THAT THAT'S NOT TRUE,

18  THAT HE WAS A SUSPECT TO MR. KUYKENDALL AND THERE WAS A REASON

19  FOR THAT.

20      THE COURT:  WELL, YOU CANNOT ELICIT FROM THIS WITNESS

21  WHETHER OR NOT A DEFENDANT WAS SUSPECT.  THAT IS NOT EVIDENCE

22  OF GUILT.  THAT IS ONLY EVIDENCE OF THE WITNESS'S BELIEF.

23      MR. MEDVENE:  THANK YOU.

24      MR. MEDRANO:  YOUR HONOR, THEN AT THIS TIME, MAY WE

25  RESPECTFULLY ASK THAT YOU STRIKE THE CROSS-EXAMINATION BY MR.

1   MEDVENE, WHERE HE ELICITED EXACTLY THAT FROM MR. KUYKENDALL.

2          HE ASKED HIM, "IN SEPTEMBER 86, IN YOUR MIND, WAS ZUNO

3   A SUSPECT?"

4          AND OVER OUR OBJECTION, YOU ALLOWED HIM TO ANSWER,

5   "YES."

6          MR. MEDVENE:  I DIDN'T ASK HIM THAT.

7          MR. MEDRANO:  PARDON ME.  "NO."

8          SO WE WOULD ASK, YOUR HONOR, THAT THAT PORTION AND

9   THOSE ANSWERS BE STRICKEN.  OTHERWISE, AT CLOSING ARGUMENT,

10  HE'S GOING TO ARGUE THAT HE WAS NEVER A SUSPECT.

11         MR. MEDVENE:  I SAID HE DIDN'T HAVE --

12         THE COURT:  JUST A MOMENT.  WAIT UNTIL THE TRANSCRIPT

13  IS PRODUCED AND WE'LL LOOK AT THE QUESTIONS AND THE ANSWERS.

14  THEN YOU CAN MAKE THE PROPER MOTION.

15         MR. MEDRANO:  VERY WELL, YOUR HONOR.

16         THE COURT:  LET'S GET THE JURY HERE.

17         AND, COUNSEL, IF YOU'RE INTENDING TO GO MUCH FURTHER

18  WITH THIS WITNESS, HE WAS BASICALLY CALLED AS A FOUNDATION

19  WITNESS AND TO DISCUSS THIS CONVERSATION HE HAD WITH MR. ZUNO.

20  I DON'T WANT TO GET INTO YOUR CASE AT THIS POINT.

21         I WOULD ASK YOU TO DEFER IF THIS IS GOING TO BE MUCH

22  LONGER.  ALL RIGHT?  THEN YOU CAN HAVE A CHANCE TO CALL HIM AS

23  YOUR OWN WITNESS.

24         MR. STOLAR:  IF HE'D BEEN AVAILABLE, I GUESS I COULD,

25  IF HE'D BE WILLING TO TALK AFTERWARDS.

1          I'LL KEEP IT SHORT.  ALL RIGHT?

2          THE COURT:  KEEP IT SHORT.

3          MR. MEDVENE:  IF THE COURT PLEASE, COUNSEL HAS JUST
4    TOLD ME THEY PLAN TO GO INTO AN 82 PLANE INCIDENT WITH MR. ZUNO
5    ABOUT "DID HE FLY A PLANE INTO TEXAS" THAT HAS NO RELEVANCE TO
6    THIS CASE, AND IT'S AN ACT THEY'VE JUST TOLD US ABOUT.

7          YOU'VE BEEN REAL STRONG AGAINST US ON TIMING.

8          THEY HAVE A D.E.A. REPORT IN 82 ABOUT MR. ZUNO FLYING
9    A PLANE INTO TEXAS AND SOME ALLEGATIONS ABOUT PHYSICAL THINGS..
10   THEY TOOK THIS AS A REPORT.  THEY DIDN'T ASK ANYBODY ELSE ABOUT
11   IT.

12         ONE, TIMELINESS:  THEY'D SURE HAVE TO GO FURTHER IF
13   IT'S A STATE STANDARD.

14         TWO, IT'S AN 82 INCIDENT, HAVING NOTHING TO DO WITH
15   THE KIDNAPPING, NOTHING TO DO WITH ANYTHING.

16         I DON'T THINK THEY SHOULD ASK IT.

17         MR. CARLTON:  YOUR HONOR, THIS IS DIRECTLY RELEVANT TO
18   THE ISSUE THAT WE JUST TALKED ABOUT.

19         THE COURT:  WHAT IS IT THAT --

20         MR. CARLTON:  IT'S ELICITED.  IT OPENED UP ON
21   CROSS-EXAMINATION.

22         THE INCIDENT IS THAT IN 1982 SPECIAL AGENT CAMARENA
23   PLACED A LOOKOUT ON MR. ZUNO'S AIRCRAFT, A TEX LOOKOUT, WHICH
24   MEANT THAT HIS NAME WAS THEN IN THE CUSTOMS COMPUTER WHEN HE
25   CAME INTO THE UNITED STATES.  NOW, APPARENTLY, MR. ZUNO WAS

1    STOPPED AS A RESULT OF THAT TEX LOOKOUT.

2          IN MAY OF -- APRIL OF 1982, AN INDIVIDUAL CAME INTO

3    THE D.E.A. OFFICE IN GUADALAJARA CLAIMING TO MR. KUYKENDALL AND

4    MR. CAMARENA THAT HE HAD JUST RECEIVED A TELEPHONE CALL FROM

5    MR. ZUNO THREATENING TO KILL HIM, KILL HIS SON, BECAUSE ZUNO

6    WAS SURE THAT HE WAS THE D.E.A. INFORMANT WHO HAD PUT HIS NAME

7    IN THE TEX LOOKOUT.

8          AND WHEN THIS INDIVIDUAL ASKED MR. ZUNO WHY HE HAD

9    DONE THAT, HE SAID, QUOTE/UNQUOTE, "ASK AGENT CAMARENA."

10         THIS IS 1982.  AND THAT'S WHY HE WAS A SUSPECT COME

11   FEBRUARY OF 1985.

12         MR. MEDVENE:  IT'S THE RANKEST HEARSAY, HAVING NOTHING

13   TO DO WITH THIS --

14         THE COURT:  CALM DOWN.

15         MR. CARLTON:  WE NEVER ELICITED THIS ON DIRECT.  THIS

16   WAS NOT PART OF THE --

17         THE COURT:  AND YOU'RE NOT GOING ELICIT IT NOW.

18         MR. CARLTON:  ALL RIGHT.

19         THE COURT:  BRING THE JURY IN.

20         THE CLERK:  PLEASE RISE.

21         (JURY PRESENT:)

22         THE COURT:  YOU MAY CONTINUE.

23

24   JAMES KUYKENDALL + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

25                CROSS-EXAMINATION + (RESUMED)

1   BY MR. STOLAR:

2   Q   GOOD AFTERNOON, MR. KUYKENDALL.  BEFORE WE BROKE FOR LUNCH,

3   I ASKED YOU TO LOOK THROUGH A SERIES OF D.E.A.-6'S ON VARIOUS

4   SPECIFICATIONS THAT HAD BEEN FILED BY AGENT CAMARENA AND

5   COUNTERSIGNED BY YOU.  AND YOU ALSO LOOKED THROUGH THEM DURING

6   THE LUNCHEON RECESS FOR A BRIEF AMOUNT OF TIME; IS THAT RIGHT?

7   A   YES, I DID.

8   Q   ON ANY OF THOSE FILE TITLES, ON ALL OF THE REPORTS THAT

9   AGENT CAMARENA DID, WERE ANY OF THOSE FILE TITLES "JUAN RAMON

10  MATTA" OR "JUAN RAMON MATTA BALLESTEROS"?

11  A   NOT THE ONES YOU SHOWED ME; NO, SIR.

12  Q   NOW, IS IT TRUE THAT SHORTLY AFTER AGENT CAMARENA

13  DISAPPEARED, FOR YOUR OWN PERSONAL USE YOU JOTTED DOWN A LIST

14  OF HOT PEOPLE YOU CONSIDERED POSSIBLE SUSPECTS OR PLACES THAT

15  YOU MIGHT POSSIBLY WANT TO GO LOOK?

16  A   PEOPLE IN GROUPS.

17  Q   PEOPLE IN GROUPS.  DOES THE NAME JUAN RAMON MATTA OR JUAN

18  RAMON MATTA BALLESTEROS APPEAR ON YOUR LIST?

19  A   NO.

20  Q   YOU INDICATED YOU HAD LISTENED TO COPIAS 2 AND 4 AND

21  IDENTIFIED AGENT CAMARENA ON IT; IS THAT RIGHT?

22  A   YES.

23  Q   DID YOU EVER LISTEN TO COPIAS 1, 3 AND 5?

24  A   YES.

25  Q   IS AGENT CAMARENA'S VOICE ON THOSE?

1   A    YES.

2   Q    IS RAFAEL CARO QUINTERO'S VOICE ON THOSE?

3   A    I DON'T KNOW.

4   Q    WERE YOU ABLE TO RECOGNIZE ANY OTHER VOICES ON IT?

5   .A    YES.

6   Q    NOW, FINALLY, THE D.E.A. OFFICE IN GUADALAJARA HAD A RADIO

7   COMMUNICATION SYSTEM, DID IT NOT?

8   A    YES.

9   Q    WERE YOU AWARE THAT ANY OF THE MARIJUANA TRAFFICKERS HAD

10  THE FREQUENCIES AND WERE LISTENING TO THE COMMUNICATIONS.

11          MR. CARLTON:  OBJECTION.  BEYOND THE SCOPE.

12          MR. STOLAR:  LAST QUESTION.

13          THE COURT:  OVERRULED.

14          THE WITNESS:  WE HAD HEARD RUMORS OF THAT.  WE WEREN'T

15  CERTAIN.

16          MR. STOLAR:  THANK YOU.  I HAVE NOTHING FURTHER AT

17  THIS TIME.

18          MR. MEZA:  A COUPLE OF QUESTIONS.

19                      CROSS-EXAMINATION +

20  BY MR. MEZA:

21  Q    IN COPIAS 2 AND 4, THE NAME OF THE PERSON THAT YOU WERE

22  FRIENDS WITH, WHAT WAS THE NAME THAT WAS REFERRED TO ON THE

23  TAPE?

24  A    I DON'T BELIEVE THE NAME WAS ON THERE, SIR.  I DON'T KNOW

25  THE NAME IS ON THERE.

15-91

1   Q   IT'S A NICKNAME; RIGHT?  YOU SAID THERE WAS A REFERENCE TO

2   A FRIEND?

3   A   I THINK THERE WERE REFERENCES TO TWO FRIENDS, SIR.

4   Q   HOW WERE THEY REFERRED TO ON THE TAPES?

5   A   ONE WAS REFERRED TO AS THE MAYOR OF A VILLAGE.  THE OTHER

6   ONE, I THINK HIS NAME IS ON THERE, LAST NAME.

7   Q   OKAY.  WHAT WAS THAT NAME?

8   A   OLIVEROS.

9   Q   WOULD YOU SPELL IT:  O  L  I --

10  A   V  E  R  O  S.

11  Q   NOW, YOU TOLD US YOU FOLLOWED A ROUTE WHICH WAS DESCRIBED

12  ON TAPE.  WHEN DID YOU FOLLOW THAT ROUTE?

13  A   WHILE I WAS STILL STATIONED IN GUADALAJARA.  I LEFT THERE

14  THE END OF SEPTEMBER 1985.

15  Q   OKAY.  SO SOMETIME BETWEEN AUGUST AND SEPTEMBER OF 85; IS

16  THAT RIGHT?

17  A   RIGHT.

18  Q   WHEN DID YOU LISTEN TO THE TAPE FIRST?

19  A   I LISTENED TO THE TAPES FIRST ON AUGUST THE 30TH 1985.

20  Q   IN WASHINGTON?

21  A   IN WASHINGTON.

22  Q   THEN YOU RETURNED AND FOLLOWED THE ROUTE?

23  A   RIGHT.  I WASN'T TRANSFERRED OUT UNTIL THE END OF SEPTEMBER

24  1985, AND I RETURNED ON ANOTHER OCCASION WITH SOME ASSISTANT

25  UNITED STATES ATTORNEYS AND FOLLOWED THE ROUTE AGAIN.

1    Q    NOW, HOW FAR IS IT -- DIRECTING YOUR ATTENTION TO EXHIBIT

2    84, HOW FAR IS IT, ROUGHLY, FROM WHERE YOU HAVE LOPE DE VEGA

3    INDICATED TO THE DESIGNATION OF FONSECA'S HOUSE?  HOW FAR IS

4    IT?

5    A    BETWEEN TWO TO THREE MILES, I THINK.  TWO MILES, TWO AND A

6    HALF MILES.

7    Q    WHERE'S THE AMERICAN CONSULATE IN RELATIONSHIP TO THE LOPE

8    DE VEGA HOUSE?

9    A    WELL, RETURNING ON MARIANO OTERO IN THE OPPOSITE DIRECTION

10   FROM WHICH THE ARROWS ARE POINTING.

11   Q    YOU'D BE HEADING EAST?

12   A    HEADING EAST, CORRECT.  YOU WOULD TRAVEL SOME THREE BLOCKS

13   AND REACH ANOTHER TRAFFIC CIRCLE, WHICH WOULD INTERSECT --

14   SEVERAL STREETS INTERSECT WITH THAT, COME INTO THAT TRAFFIC

15   CIRCLE.  ONE OF THEM IS CHAPULTEPEC AVENUE.

16        YOU WOULD MAKE A LEFT ON CHAPULTEPEC AVENUE AND TRAVEL

17   ABOUT FOUR BLOCKS, I SUPPOSE, AND YOU WOULD MEET LIBERTAD AND

18   TURN TO THE RIGHT ON LIBERTAD AND GO A BLOCK.

19   Q    ALL RIGHT.  THE TROUBLE THAT THE AGENTS -- THAT AGENT

20   CAMARENA MENTIONED CONCERNING THE PAYCHECKS, YOU WERE AWARE OF

21   THAT; CORRECT?

22   A    YES.

23   Q    ALL RIGHT.  DID HE EVER COME TO YOU FOR ANY MONEY?

24   A    NO.

25   Q    DID YOU LOAN HIM ANY MONEY?

1    A    NO.

2    Q    THE TAPES THAT YOU RECEIVED IN AUGUST, YOU WERE AWARE THAT

3    THERE WERE TAPES IN EXISTENCE PRIOR TO YOUR RECEIPT OF THEM;

4    ISN'T THAT RIGHT?

5    A    YES.

6    Q    AND WHEN WERE YOU FIRST MADE AWARE OF THE EXISTENCE OF

7    THESE TAPES?

8    A    APRIL THE -- (PAUSE.)

9    Q    12TH.

10   A    12TH?   11TH OR 12TH, OR RIGHT AFTER, YES.

11   Q    YOU WERE IN MEXICO CITY, WERE YOU NOT, WHEN YOU FIRST

12   RECEIVED THE INFORMATION?

13   A    NO.   I WAS IN GUADALAJARA.

14   Q    AND WHEN YOU RECEIVED THE INFORMATION CONCERNING THE

15   POSSIBLE EXISTENCE OF TAPES, YOU FLEW TO MEXICO CITY; IS THAT

16   RIGHT?

17   A    THAT'S RIGHT.

18   Q    AND YOU WENT WITH MR. KUNTZ (PHONETIC)?

19   A    I ACCOMPANIED HIM.   YES, I DID.

20   Q    WHEN YOU GOT TO MEXICO CITY, YOU MET WITH MR. WHITE, DID

21   YOU NOT?

22   A    YES, I DID.

23   Q    AND YOU DISCUSSED WITH HIM THE POSSIBLE EXISTENCE OF THESE

24   TAPES?

25   A    THAT'S CORRECT.

1     Q    AND HE SHOWED YOU A DOCUMENT, DID HE NOT, THAT CONCERNED

2     THE POSSIBLE EXISTENCE OF THESE TAPES?

3     A    I DON'T RECALL NOW IF I ACTUALLY SAW A DOCUMENT OR HE TOLD

4     ME WHAT HE HAD READ FROM THE DOCUMENT.

5     Q    DO YOU KNOW WHO GENERATED THAT DOCUMENT?

6     A    I KNOW WHAT HE TOLD ME.

7     Q    WHAT WERE YOU TOLD?

8         MR. CARLTON: OBJECTION. HEARSAY.

9         THE COURT: SUSTAINED.

10    BY MR. MEZA:

11    Q    WELL, AFTER YOU WERE TOLD ABOUT THE DOCUMENT, WHAT DID YOU

12    DO NEXT?

13    A    ON THAT PARTICULAR DAY, NOTHING.

14    Q    WELL, DIDN'T THE DOCUMENT CAUSE YOU TO YOU BELIEVE THAT, IN

15    FACT, TAPES WERE IN EXISTENCE?

16         MR. CARLTON: OBJECTION. IRRELEVANT.

17         THE COURT: SUSTAINED.

18    BY MR. MEZA:

19    Q    AS A RESULT OF THE INFORMATION RECEIVED FROM MR. WHITE,

20    DIDN'T YOU PURSUE -- FURTHER PURSUE -- WHETHER OR NOT THE

21    DATE -- THE DOCUMENTS, OR THE TAPES, WERE IN EXISTENCE?

22    A    YES, SIR.

23    Q    WHAT WAS THERE ABOUT THE INFORMATION THAT MR. WHITE GAVE

24    YOU THAT CAUSED YOU TO FURTHER PURSUE THE EXISTENCE OF THESE

25    TAPES?

1      MR. CARLTON:  OBJECTION.  IRRELEVANT.

2      THE COURT:  SUSTAINED.

3   BY MR. MEZA:

4   Q   ALL RIGHT.  IF YOU WOULD, MS. CLERK, EXHIBIT 63, IS THAT UP

5   ·HERE?  I KNOW I MADE A REQUEST EARLIER.

6      THE COURT:  YOU WISH THE WITNESS TO LOOK AT EXHIBIT

7   63?

8      MR. MEZA:  YES, YOUR HONOR.

9      (EXHIBIT PROVIDED TO DO WITNESS.)

10  BY MR. MEZA:

11  Q   SEE THAT IN FRONT OF YOU?  IT'S A PHOTOGRAPH?

12  A   RIGHT.

13  Q   ALL RIGHT.  OTHER THAN AGENT CAMERENA, YOU INDICATE YOU

14  KNOW AT LEAST ONE OF THE OTHER INDIVIDUALS, DO YOU NOT?

15  A   I KNOW ONLY ONE OF THE OTHER INDIVIDUALS.

16  Q   AND WHICH -- IS THAT PERSON IN THE PHOTOGRAPH?  IS HE THE

17  PERSON IN THE MIDDLE OR TO THE RIGHT?

18  A   IN THE MIDDLE.  THE MAN WITH GLASSES.

19  Q   WHAT IS HIS NAME?

20  A   ROBERTO VALDEZ.

21  Q   DO YOU KNOW THE NAME OF THE OTHER PERSON?

22  A   NO, I DO NOT.

23  Q   HAVE YOU EVER SEEN THAT OTHER PERSON BEFORE?

24  A   NOT TO MY KNOWLEDGE.

25     MR. MEZA:  THAT CONCLUDES THE CROSS, YOUR HONOR.

15-96

1      I HAVE -- I WOULD LIKE THIS WITNESS TO REMAIN

2   AVAILABLE AT A FUTURE TIME.  THANK YOU.

3          THE COURT:  ALL RIGHT.

4          MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

5          THE COURT:  ANY REDIRECT?

6          MR. CARLTON:  JUST A FEW QUESTIONS, YOUR HONOR.

7                  REDIRECT EXAMINATION +

8   BY MR. CARLTON:

9   Q    MR. KUYKENDALL, HOW LONG WERE YOU ACTIVELY INVOLVED IN THE

10  INVESTIGATION OF AGENT CAMARENA'S DISAPPEARANCE AND MURDER, ON

11  A DAILY BASIS?

12  A    UNTIL MAYBE THE END OF APRIL, SOMETHING LIKE THAT.

13  Q    OF 1985?

14  A    1985.

15  Q    AND THIS INVESTIGATION WAS GIVEN THE CODE NAME "LEYENDA";

16  IS THAT CORRECT?

17  A    YES, IT WAS.

18  Q    AND AFTER APRIL OF 1985, WERE YOU OFFICIALLY A PART OF THE

19  LEYENDA INVESTIGATION?

20  A    NO.

21  Q    AND AFTER THAT POINT, DID YOU HAVE REGULAR ACCESS TO THE

22  EVIDENCE AND INFORMATION OBTAINED IN THE COURSE OF THE

23  INVESTIGATION?

24  A    NO.

25  Q    WERE YOU ASKED THEN TO ASSIST THE INVESTIGATION ON AN

1    OCCASIONAL BASIS?

2    A    YES.

3    Q    NOW, TURNING TO THE LIST THAT YOU JUST TESTIFIED TO, THE

4    LIST THAT YOU PREPARED IN FEBRUARY OF 1985, WAS THAT A LIST OF

5    EVERYONE WHO WAS POTENTIALLY A SUSPECT IN AGENT CAMARENA'S

6    ABDUCTION?

7    A    NO.

8    Q    WELL, WHAT WAS THAT LIST?

9    A    THEY WERE JUST LISTS OF INDIVIDUALS AND GROUPS OF

10   INDIVIDUALS THAT I THOUGHT SHOULD BE CHECKED OUT AS SOON AS

11   POSSIBLE.

12   Q    NOT EVERYONE YOU THOUGHT SHOULD BE CHECKED OUT?

13   A    NO.

14   Q    NOW, DO YOU RECALL HOW YOUR MEETING WITH MR. ZUNO IN 1986

15   CAME ABOUT?

16   A    IT WAS MUTUALLY ARRANGED BETWEEN MYSELF AND AGENT

17   RODRIGUEZ, ART RODRIGUEZ.

18   Q    DO YOU RECALL WHETHER IT WAS SUGGESTED TO YOU?

19   A    NO, I DO NOT, SIR.

20   Q    COULD HAVE BEEN?

21   A    IT'S POSSIBLE.

22            MR. CARLTON:   JUST A MOMENT, YOUR HONOR.

23            (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

24   BY MR. CARLTON:

25   Q    WHAT OTHER NAMES WERE ON THE LIST THAT YOU PREPARED?

1    MR. MEDVENE:  OBJECTION.  RELEVANCE, MATERIALITY.

2    THE COURT:  SUSTAINED.

3    MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

4    THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

5    MR. STOLAR:  SUBJECT TO FURTHER RECALL.

6    THE COURT:  YES.

7    MR. CARLTON:  WE WOULD ASK AT THIS TIME, YOUR HONOR,

8    TO PLAY THE TAPES.

9    MR. STOLAR:  THE TAPES HAVE NOT BEEN MOVED INTO

10   EVIDENCE YET; AND WHEN THEY ARE, I'D LIKE TO LODGE AN

11   OBJECTION.

12   THE COURT:  HAVE YOU OFFERED THE TAPES INTO EVIDENCE?

13   HAVE THEY BEEN RECEIVED?

14   MR. CARLTON:  IF THAT'S A PRECONDITION, I WILL NOW

15   OFFER THEM INTO EVIDENCE.

16   THE COURT:  IT IS.  I'M NOT SURE WHETHER THEY HAVE

17   BEEN OR NOT, BUT IF NOT --

18   MR. STOLAR:  THEY HAVE NOT.

19   THE COURT:  ALL RIGHT.

20   MR. STOLAR:  ALL RIGHT.  IS GOVERNMENT'S EXHIBIT 74

21   BEING OFFERED IN EVIDENCE?

22   MR. CARLTON:  WE WOULD AT THIS TIME -- AT THIS TIME,

23   YOUR HONOR, WE WOULD MOVE IN GOVERNMENT'S 82 AND 83.

24   MR. STOLAR:  WHICH ARE?

25   MR. CARLTON:  THE TWO VIDEOTAPES.

15-129

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS FOR THE U.S.
DISTRICT COURTS, CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER.

*Julie Churchill*                           DATED: June 28, 1990
JULIE A. CHURCHILL
OFFICIAL COURT REPORTER

*Susan A. Lee*                              DATED: June 28, 1990
SUSAN A. LEE
OFFICIAL COURT REPORTER